**OHIO VALLEY ELECTRIC CORPORA- TION, Indiana-Kentucky Electric Corporation, Plaintiffs,**

v.

**GENERAL ELECTRIC COMPANY, Westinghouse Electric Corporation, Defendants.**

United States District Court
S. D. New York.

Aug. 31, 1965.

916

Kaye, Scholer, Fierman, Hays & Handler, New York City, Milton Handler,

James B. Henry, David Klingsberg, Michael Malina, Franklin G. Lehmeier, Stephen Banner and William M. Borchard, New York City, of counsel, for plaintiffs.

White & Case, New York City, Chadwell, Keck, Kayser, Ruggles & McLaren, Chicago, Ill., Edgar E. Barton, Thomas B. Leary, George J. Caspar, New York City, John T. Chadwell, John W. Thomas, Luther C. McKinney, Chicago, Ill., of counsel, for defendant General Electric Co.

Cravath, Swaine & Moore, New York City, Albert R. Connelly, Richard F. de Lima, George J. Wade, New York City, of counsel, for defendant Westinghouse Electric Corp.

FEINBERG, District Judge.

Criminal antitrust proceedings were brought in 1960 by the United States Government against electrical equipment manufacturers in the Eastern District of Pennsylvania. Thereafter, various purchasers of electrical equipment filed an unprecedented number of private antitrust actions against the manufacturers.[1] This case is the first of those suits to come to trial in this court. It grows out of the purchase of eleven steam turbine generators in 1952 by plaintiffs Ohio Valley Electric Corporation (OVEC) and Indiana-Kentucky Electric Corporation (IKEC) from defendants General Electric Company (GE) and Westinghouse Electric Corporation (Westinghouse). Plaintiffs sue for treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, alleging a price fixing conspiracy among GE, Westinghouse and other manufacturers in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. After extensive national and local pre-trial discovery and conferences, the non-jury trial commenced on February 16, 1965, and ended approximately two months later.[2] There were thirty-six witnesses, many by

---

1. For a description of these suits, see Neal and Goldberg, The Electrical Equipment Antitrust Cases: Novel Judicial Administration, 50 A.B.A.J. 621–28 (1964).

2. Thirty-five trial days were consumed, plus an adjournment of five trial days to allow the court to read approximately 2,100 pages of offered deposition testimony.

deposition, over 5,200 pages of transcript, and over 690 exhibits.

I

*The Parties*

OVEC is an Ohio corporation owned by various investor-owned electric utility companies in the Ohio River Valley. IKEC is an Indiana corporation and a wholly-owned subsidiary of OVEC. Both plaintiffs were incorporated in 1952 to construct and operate facilities required to provide an unusually large supply of electric power to a new plant of the United States Atomic Energy Commission (AEC) near Portsmouth, Ohio. OVEC owns steam electric generating facilities in Ohio at its Kyger Creek plant, which contains five steam turbine generators known as Kyger Creek 1–5. OVEC is and has been engaged in the generation and transmission of electric energy in Ohio and the transmission of electric energy in Kentucky. IKEC owns steam electric generating facilities in Indiana at its Clifty Creek plant, which contains six steam turbine generators known as Clifty Creek 1–6. It is and has been engaged in the generation and transmission of electric energy in Indiana. The purchase of the Kyger Creek 1–5 and Clifty Creek 1–6 units gave rise to this suit.

OVEC and IKEC provide power to the AEC and also to other utilities, including their sponsoring or participating companies. These companies agreed to purchase any surplus power available from the new facilities and not required by the AEC, including power made available through cancellation of the arrangements with the AEC. The utilities so agreeing, as well as those owning OVEC's capital stock, are as follows:

| Name of Company | % Participation | |
| --- | --- | --- |
| | Equity | Power |
| American Gas and Electric Company [3] | 37.8 | |
| Appalachian Electric Power Company | | 15.2 |
| Indiana & Michigan Electric Company | | 7.6 |
| Ohio Power Company | | 15.0 |
| The Cincinnati Gas & Electric Company | 9.0 | 9.0 |
| Columbus and Southern Ohio Electric Company | 4.3 | 4.3 |
| The Dayton Power and Light Company | 4.9 | 4.9 |
| Kentucky Utilities Company | 2.5 | 2.5 |
| Louisville Gas and Electric Company | 7.0 | 7.0 |
| Ohio Edison Company | 16.5 | 14.5 |
| Pennsylvania Power Company | | 2.0 |
| Southern Indiana Gas and Electric Company | 1.5 | 1.5 |
| The Toledo Edison Company | 4.0 | 4.0 |
| The West Penn Electric Company | 12.5 | |
| Monongahela Power Company | | 3.5 |
| The Potomac Edison Company | | 2.0 |
| West Penn Power Company | | 7.0 [4] |

◆

Defendant GE is a New York corporation with its principal place of business in Schenectady, New York. At all relevant times, it manufactured and sold

3. In 1958, the name of American Gas and Electric Company was changed to American Electric Power Company (AEP) and similar changes of name were made in other companies in the system. Transcript (hereinafter cited as "Tr."), p. 412.

4. General Electric Exhibit (hereinafter cited as "GE") 210, p. 4; 214, p. 327.

steam turbine generators of varying sizes. It has maintained plants for the manufacture of such units at Schenectady, New York; West Lynn, Massachusetts; and Fitchburg, Massachusetts. IKEC's six units (Clifty Creek 1–6) and one of OVEC's units (Kyger Creek 1) were purchased from GE.

Defendant Westinghouse is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. At all relevant times, it manufactured and sold steam turbine generators of varying sizes. It has maintained plants for the manufacture of steam turbines at Lester, Pennsylvania and Sunnyvale, California, and a plant for the manufacture of generators at East Pittsburgh, Pennsylvania. OVEC purchased four of its units (Kyger Creek 2–5) from Westinghouse. Each defendant is an inhabitant of, or is found or transacts business in, the Southern District of New York.

Allis-Chalmers Manufacturing Company (Allis) was also originally named as a party defendant. However, by stipulation just prior to trial, plaintiffs dismissed the action against Allis without prejudice, but amended the complaint to allege that Allis was a co-conspirator.[5] Allis is a Delaware corporation which, at all relevant times prior to 1963, was engaged in the manufacture and sale of steam turbine generators and maintained a plant for the manufacture of such units at West Allis, Wisconsin. At the time of the purchases sued upon, GE, Westinghouse and Allis were the three largest manufacturers and sellers of steam turbine generators in the United States. On January 1, 1963, Allis went out of the steam turbine generator business. Another co-conspirator named in the complaint was Elliott Company (Elliott), now a subsidiary of Carrier Corporation, a Delaware corporation. At all relevant times, Elliott was engaged in the manufacture of steam turbine generators.

*Theory of the Case*

Plaintiffs claim that, because of the alleged price-fixing conspiracy, they paid substantially more for the eleven steam turbine generator units purchased from defendants than they would have paid in a competitive (non-conspiratorial) market. To understand the contentions of the parties, some description of a steam turbine generator and the manner in which it is sold is necessary. A steam turbine generator unit is an assembly of a turbine and a generator used in the production or generation of electric energy on land by the use of steam. Steam turbine generators are complicated and frequently massive machines. They are made in a great variety of sizes, types and capabilities, with varying accessories and features, to perform under a number of operating conditions. For example, turbines differ according to the amount of kilowatts of electricity that can be generated, the type of fuel required, and the number of large shafts driving the generator.[6] Specifications are detailed and extensive. The time required for manufacture of a unit is generally two to three years after date of order and sometimes even longer.

Steam turbine generators manufactured by both defendants have been sold and shipped in interstate commerce throughout the United States to investor-owned electric utilities and to federal, state and local governmental agencies for use in the generation of electricity. The pricing of these machines is complicated and requires the use of price books issued by the manufacturers. These books serve both as a technical manual and as a measure for comparing prices of machines made by different companies and of different types of machines made by the same company. From such a book, a price for a basic unit can be determined, after certain specifications have been assumed; e. g., electric output required. The prices

5. Local Pre-Trial Order No. 15, dated February 10, 1965.

6. In a cross-compound steam generator, steam is converted into electrical energy

by employing two shafts, whereas in a tandem machine the same process is accomplished by use of one shaft. Tr. p. 441.

contained in the price books are known to the trade as the "book" or "list" or "published" price. Similarly, the actual sale price or price agreed to be paid at the time of order for a steam turbine unit is known as the "order price."

Plaintiffs assert that during the existence of the alleged conspiracy, sales were generally made at book prices or at prices close to the book price level, that order prices below the book level were frequently expressed as a percentage discount from the appropriate book price, or "discount off book," and that book prices over the years were essentially the same for all three manufacturers. Plaintiffs claim that defendants conspired to establish uniform book prices and to keep order prices as close as possible to book, and that the order prices in 1952 for the eleven OVEC and IKEC units were, therefore, unlawfully fixed. Plaintiffs claim damages of $8,167,773, trebled, based upon a discount off book theory, which will be set forth in greater detail below.

Plaintiffs also suggest another theory of damages. In the manufacture of steam turbines, there is substantial delay between date of order and date of delivery and installation. Accordingly, in the 1950's, it was not uncommon for a manufacturer and a buyer to agree, as was done here, that the buyer would pay on the basis of the Price in Effect at the Time of Shipment of the unit (PETS escalation clause). This might result in substantial "escalation" of the total amount to be paid. Plaintiffs argue that the final billed price in 1954–1955 on the eleven units ordered in 1952 included an illegal overcharge attributable to escalation; that, had a truly competitive price been in effect at the time of shipment, the final billed price would have been substantially lower. This claimed overcharge because of "escalation" is $5,089,035, computed in a manner set forth in greater detail below.

Defendants vigorously dispute the essentials of plaintiffs' case; they claim that there was no conspiracy in effect at the time of plaintiffs' purchases and that, in any event, any conspiracy had absolutely no effect on the prices plaintiffs paid. Defendants contend that with or without conspiracy these prices were the result of the economic forces at work in the market; e. g., demand, supply, cost, individual bargaining. Defendants also assert that plaintiffs cannot recover, even if they were illegally overcharged, because (1) the claims are barred by the applicable four-year statute of limitations, section 4B of the Clayton Act, 15 U.S.C. § 15b, and (2) plaintiffs suffered no legal damage because they were, or will be, able to "pass-on" the assumed overcharges to others, principally the AEC. Before considering these and other key issues in detail, a description of the actual transactions in suit will be helpful.

*Transactions in Suit*

In the second half of 1951, Philip Sporn, then chief executive officer of the American Gas and Electric utility system, became interested in the plans of the AEC to locate a new power station in the Ohio Valley. In early 1952, Sporn and other Ohio Valley utility company executives met with representatives of the AEC to obtain information and to discuss problems the utilities would face in supplying power to the new plant. The utilities were informed that 1,800,000 kilowatts of electrical demand with an annual consumption of 15 billion kilowatt hours would be required.[7] This was then twenty-five per cent more than the annual consumption of electric power by the eight million residents of New York City.[8] The entire operation had to be fully effective by mid-1956.

Soon after this meeting with the AEC, the participating utilities agreed to organize separate corporate entities to erect two plants to supply the energy required.[9] Sporn was designated to negotiate the necessary contracts with the AEC and the manufacturers of steam turbines. OVEC and IKEC were incor-

---

7. Tr. pp. 423–26.

8. Tr. p. 426.

9. Tr. pp. 431–32.

porated on October 1, 1952; the United States, on October 15, 1952, entered into a contract with OVEC for the supply of electricity to the AEC.[10]

Early in 1952, before the formal creation of OVEC and IKEC, Sporn began negotiations with GE for the purchase of steam turbine generators. In March 1952, it was decided that the machines were to be cross-compound units (instead of tandem-compound) of 2,000 pounds pressure, 1050° initial steam and reheat temperature, with a maximum output rating of 217,260 kilowatts.[11] At that time, the contemplated machines represented the best of the industry's technology and were among the largest and most efficient units ever ordered. Moreover, the order for eleven units totalling over 2,350,000 kilowatts was a huge one, comprising over twenty-two per cent of total kilowatt generating capacity ordered in 1952 by customers of the manufacturers.[12] GE representatives quoted a handbook price for these units, which they characterized as two per cent too high due to an error in calculation. As a result of bargaining, GE also offered an additional 2.5 per cent discount for a total of 4.5 per cent off the published handbook price.[13] Further discussions between the parties resulted in GE's offering an additional 3.1 per cent more off handbook price if it were given an order for eight units.[14] This was later agreed to apply to seven units. Despite strenuous efforts by Sporn, GE refused to reduce its price any further, even if it received the entire order of eleven units.[15] GE was principally represented at the various bargaining sessions by G. B. Warren, General Manager, Turbine Division, and Robert S. Neblett, Manager of Marketing, Turbine Division.[16] Sporn and S. N. Fiala, AEP Chief Engineer, were the chief representatives of OVEC and IKEC.

Sporn intended, if he could, to split the units to be purchased between GE and Westinghouse, both for reasons of national defense and because members of the OVEC and IKEC boards of directors desired it.[17] In October 1952, GE was given clearance on six units to be supplied to the Clifty Creek plant of IKEC.[18] By this time, Sporn and GE had agreed upon a unit price of $4,643,255.[19] An additional amount for special accessories was later agreed upon.[20]

Meanwhile, Sporn had been sounding out Westinghouse and, in November 1952, received a Westinghouse proposed price for a similar unit about $200,000 higher than the GE unit price.[21] Thereafter, a series of discussions ensued between Sporn and various Westinghouse officials during which Sporn attempted to play off GE against Westinghouse to get the lowest price he could. Sporn, on November 29, 1952, finally persuaded Westinghouse to cut its price to $4,675,000 per unit for four machines which were to be supplied to the Kyger Creek plant of OVEC.[22] The price for special accessories was later agreed upon.[23] The eleventh unit (the fifth for the Kyger Creek plant) was purchased from GE. The principal negotiators for Westinghouse were Gwilym A. Price, Chief Executive Officer, and John K. Hodnette, Executive Vice President;[24] Sporn and Fiala again represented plaintiffs.

The parties have stipulated that what they call the final order price for the six GE machines supplied to IKEC and the

---

10. Tr. pp. 433–36; GE 206.

11. Tr. pp. 455–56.

12. Plaintiffs' exhibit (hereinafter cited as "PX") 26, app. A, pp. A–19–21, A–55–57.

13. Tr. p. 457; PX 33.

14. Tr. pp. 458–59.

15. Tr. pp. 485–86, 511–12; PX 49.

16. Tr. pp. 440, 455–56.

17. Tr. pp. 479–80, 500–02.

18. Tr. p. 486.

19. PX 27, app. D.

20. Westinghouse exhibit (hereinafter cited as "W") 9; PX 27, app. D.

21. Tr. pp. 791–93, 2388–90; W 1.

22. Tr. pp. 519–22; PX 5.

23. Tr. pp. 521–22; PX 27, app. D.

24. Tr pp. 496, 519.

one to OVEC was $4,718,255 per unit and that the applicable GE book price was $5,308,000.[25] These stipulated figures produce a discount off book at which the GE units were purchased of 11.1 per cent.[26] Final order price is defined as the final price, excluding escalation for the base unit, but including standard accessories, supervision of erection and special accessories. The same stipulation provides that the final order price of the four Westinghouse machines supplied to OVEC was $4,750,000 per unit and that the applicable Westinghouse book price was $5,395,615.[27] Similarly, the discount off book at which these units were purchased was 11.97 per cent.[28] These final order price figures for GE and Westinghouse include $75,000 per unit as the agreed-to price for special accessories. In each case, the price for this item was a reduction from the original figure quoted by the manufacturers.[29]

The contracts with GE and Westinghouse both contained the PETS escalation clause, subjecting the order price of the steam turbine generators to adjustment up to a maximum of twenty per cent, determined by application of the seller's published price in effect at the time of actual shipment.[30] At a meeting in late 1954, when the first two GE units were about ready for shipment, GE and Sporn agreed on a final billed price on the first five GE units of $5,200,000.[31] This represented about a ten per cent escalation upward from the final order price and was based upon the 1953 GE book price.[32] In January 1955, the parties similarly agreed upon a final billed price of $5,200,000 for the remaining two GE machines.[33] The amount of escalation applicable to the base unit, standard accessories, supervision of erection and special accessories, determined by subtracting the final order price from the final billed price paid to GE was as follows: $481,745 on each of Clifty Creek units 1, 4–6 (sold to IKEC) and Kyger Creek 1 (sold to OVEC), and $371,658 and $388,651, respectively, on Clifty Creek units 2 and 3 (sold to IK EC).[34] The total final order price for the units purchased from GE was $33,027,785, and the total final price after escalation was $36,196,819.[35] These units were actually shipped to plaintiffs over a period from November 1954 to January 1956.[36]

In January 1955, Westinghouse and Sporn agreed that the final billed price for each of the four Westinghouse units

25. PX 27, app. D.

26. The figure for discount off book was not stipulated but the data upon which it is based was. PX 27, app. D; Tr. p. 357. Defendants' claim that the discount off book was larger is rejected. See note 211 infra. It is not precisely clear how the stipulated figures were arrived at producing the 11.1% discount (which plaintiffs are willing to accept) in view of the discount off book figures in the text totalling 7.6%. The explanation probably lies in the treatment accorded by the parties to the 3.37% price increase announced by GE March 3, 1952, effective December 21, 1951.

27. PX 27, app. D.

28. See note 26 supra.

29. GE originally sought $90,510 for the special accessories, W 9; GE 148; Westinghouse originally quoted a figure of $121,192 per unit. Tr. pp. 2410–11; W 9.

30. PX 5, pp. 390–91; PX 52, p. 38; PX 54, p. 10; PX 55, p. 10. In theory, the adjustment could be downward as well as upward. PX 24, p. 324.

31. Tr. pp. 1461–64; GE 45.

32. As a result of subsequent negotiations, further reductions were made in the final prices of two of these units (Clifty Creek 2 to $5,089,913 and Clifty Creek 3 to $5,106,906). Tr. pp. 1466–75; GE 31; PX 27.

33. Tr. p. 1466; GE 28.

34. PX 27, app. D.

35. Ibid.

36. Units and dates of shipment were as follows (PX 27, app. D):

| Unit | Date of Shipment |
| --- | --- |
| Clifty Creek 1 | November 1954 |
| Kyger Creek 1 | December 1954 |
| Clifty Creek 2 | February 1955 |
| Clifty Creek 3 | May 1955 |
| Clifty Creek 4, 5 | October 1955 |
| Clifty Creek 6 | January 1956 |

would be $5,230,000.[37] This agreement was based upon an increase in the Westinghouse book price in April 1953. The amount of escalation on each unit was $480,000, similarly about ten per cent of the final order price. The total order price of the Westinghouse units was $19,000,000 and the final billed price after escalation was $20,920,000.[38] These units were actually shipped by Westinghouse to OVEC from April to October 1955.[39]

Defendants contend that Sporn was an excellent negotiator who achieved remarkable results in the price negotiations. Thus, in addition to the concessions already referred to made in the course of bargaining, defendants point to the fact that the price for spare parts was negotiated downward by over $630,000 with GE [40] and over $800,000 with Westinghouse,[41] that the escalation imposed was less than it could have been under the formula in effect, and that various charges were absorbed by the manufacturers which, arguably, they could have refused to pay.[42] There is no doubt that defendants are correct in characterizing Sporn as an unusually able negotiator. The real question is whether the negotiations occurred within a framework of conspiratorial activity which so pervaded the basic price structure that no negotiator, even one with the herculean abilities attributed by defendants to Sporn, could press beyond certain limits. This, of course, raises the key issues of (1) was there a conspiracy to fix prices and (2) did this conspiracy affect the prices of the OVEC and IKEC units and, if so, to what extent?

## II

*Conspiracy*

On the first issue, plaintiffs have clearly proved the existence of a price-fixing conspiracy in 1952, the time of the purchases in suit. There is testimony that specific meetings among defendants and other competitors began as early as 1939. The record shows that Neblett of GE met with representatives of Westinghouse in that year to discuss a steam turbine job lost by GE as a result of a large Westinghouse price cut.[43] At that time, Erben, GE's Manager of Apparatus Division, who "wasn't very happy" over the price cut, indicated to his competitors his preference for established prices in the industry.[44] Presumably toward this end, Neblett met with Westinghouse employees in 1940, "to again explain" GE's price sheets,[45] a practice which, thereafter, was habitually followed by some GE employees whenever a competitor made such a request. Competitors' meetings were held frequently during the ensuing decade.[46] Specifically, Ganschird, Westinghouse Large Turbine Section Sales Manager, was placed at competitors' meetings in the 1940's; [47] Whitescarver of GE testified to meetings from 1941 through 1957 and could not be sure whether there was any one year during this period in which he did not meet with competitors; [48] Mauntel, Westinghouse Sales Manager, Steam Division, recalled meetings in 1948; [49] Sellers, then Elliott's Turbine Generator Department Sales Manager, testified to meetings commencing in 1945, perhaps a dozen a year in some years thereafter.[50]

---

37. Tr. p. 2414; W 11, 58.

38. PX 27, app. D.

39. Kyger Creek units 2 and 3 were shipped in April and July, respectively; units 4 and 5 in October. Ibid.

40. Tr. pp. 592–95; PX 27, 37, 53; GE 10; W 9.

41. Tr. pp. 2400–03; W 51, 52, 56; PX 27.

42. E.g., Westinghouse absorbed $100,000 expense for deblading the units to raise the kilowatt capacity (Tr. p. 2417), and paid OVEC approximately $168,000 for

overtime on supervision of erection of the units (Tr. pp. 2418–19; W 59A).

43. PX 3, pp. 11, 31–34.

44. PX 3, pp. 35–36.

45. PX 3, p. 37.

46. PX 3, p. 37; PX 7, p. 110; PX 9, pp. 28, 104, 106; PX 10, pp. 71, 75, 178.

47. PX 7, p. 109; PX 10, p. 178.

48. PX 9, p. 28.

49. PX 7, p. 110.

50. PX 10, pp. 74–75.

It is fair to say, as a general proposition, that the topics discussed at these meetings were not properly the subjects of communication among competitors.[51] Significantly, in the years since 1946, the number of large steam turbine generator units sold annually was never so high that those in the business could not easily keep track of individual transactions; the total fluctuated from about a low of twelve in 1949 to 159 in 1950.[52]

For present purposes, an early significant meeting took place in 1950 in New York City. In the fall of that year, Neblett of GE met with Mauntel and Eikner of Westinghouse and Miers of Allis after GE had just issued a new price book which made elaborate changes in the old book and included for the first time units similar in many respects to the units plaintiffs ultimately purchased. Neblett explained these changes to the other competitors, at their request, at a time when it is not clear whether Westinghouse and Allis had issued revised price books of their own,[53] although it is clear that by the end of 1950 the price books of the three companies were highly similar and incorporated a general ten per cent increase.[54] For all practical purposes, these pric ebooks substantially reflected the price levels in effect during the OVEC negotiations for an OVEC-type unit and were consulted when pricing these machines.[55] There is also some specific evidence of a meeting or meetings of competitors in 1952.[56]

It is instructive to pause at this point to consider the stipulated evidence of uniform book price movements during the period from 1948 to 1952.[57] Effective December 27, 1948, GE increased handbook prices approximately ten per cent for turbines rated 20,000 kilowatts and above.

Westinghouse, shortly thereafter, adopted a similar book price increase effective December 30, 1948; Allis followed suit with a book price increase effective January 3, 1949. In the fall of 1950, GE, Westinghouse and Allis all announced another ten per cent increase on units rated 20,000 kilowatts and above; the GE increase was effective on October 16, 1950; the Westinghouse and Allis increases were effective October 21, 1950 and October 30, 1950, respectively.

Despite different authorizations from the Office of Price Stabilization ("OPS"), the next series of book price changes resulted in almost identical increases after a short period when the prices of the three major producers varied. The GE price increases effective December 21, 1951, averaged 3.37 per cent for turbines rated at 20,000 kilowatts and above and a 4.9 per cent increase for smaller units. The Westinghouse increases effective December 20, 1951 were similar. The increases for the larger units were less than the amount authorized by OPS. Allis initially increased all its prices by 10.52 per cent—the full amount of its OPS authorization—effective January 10, 1952. However, on March 21, 1952, Allis withdrew the 10.52 per cent price increase and announced a new price increase to conform with those previously announced by GE and Westinghouse— 3.37 per cent for units larger than 20,000 kilowatts and 4.9 per cent on smaller units.

Plaintiffs have not merely offered stipulated proof of identical book price movements during 1948–1952. They have also demonstrated, by reliable statistical evi-

51. PX 7, p. 14; PX 9, p. 45.

52. PX 206.

53. PX 3, pp. 18–22; PX 310, 311. It is fairly clear that Peters, GE's "price guy," PX 7, p. 19, was invited to attend this meeting. PX 6, p. 78. Although, on several previous occasions, Peters said that he in fact attended, e.g., PX 6, p. 78; see PX 307, at trial, he denied his presence. Tr. pp. 3711a–12.

54. PX 71.

55. E.g., Tr. p. 3800.

56. PX 3, pp. 22, 41. A reheat feature common to plaintiffs' units was added to the GE price book of March 1952. Tr. p. 3793; PX 308.

57. The information for this discussion comes from PX 25.

dence, that during this period sales of large steam turbine generators by all the competitors were made within the same low range of discounts off highly similar book prices.[58]

If the foregoing were the sole evidence of conspiracy in this record, I would conclude, from these indications of price discussions among competitors followed by uniform price movements, that prior to and during 1952 defendants violated the Sherman Act. E. g., (all involving criminal convictions and, therefore, a greater burden of proof than applicable here) Pittsburgh Plate Glass Co. v. United States, 260 F.2d 397, 400–401 (4th Cir. 1958), aff'd on other grounds, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); Morton Salt Co. v. United States, 235 F. 2d 573 (10th Cir. 1956); C-O-Two Fire Equip. Co. v. United States, 197 F.2d 489 (9th Cir.), cert. denied, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952); see Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 398, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959) ("While * * * [there] * * * was only [one] witness who characterized the outcome of the meetings as an 'agreement' on prices, no witness negatived this conclusion and the identical price lists that followed the meeting * * * were little less than proof positive.").

Additionally, there is an overwhelming amount of detailed evidence of meetings and discussions on a regular basis from this period until 1959, and there are strong indications that these later meetings typified the earlier ones. The fol-lowing subjects discussed at post-1952 meetings were identified as being the same as those discussed in the earlier period:[59] prices; "position" (agreement as to who would present the lowest bid); terms and conditions of sale;[60] present and future book prices;[61] past and future bids;[62] escalation and progress payments;[63] discounts off book prices and maintenance and stabilization of order prices and market levels.[64] Moreover, the participants in these later meetings were either the original conspirators or their corporate successors. For example, Neblett of GE, who was present at the early 1939 and 1940 meetings, and out of the turbine business for a while, continued to participate again until at least late 1955.[65] It should be noted that Neblett was one of the chief negotiators for GE on the very units in suit and the GE representative who, although severely pressed, refused to lower GE's price to Sporn even if GE received all eleven units instead of just seven.[66] Neblett, who was Peters's superior, introduced Peters into the conspiracy in the early 1950's. When McLane replaced Neblett as GE's Acting Manager of Marketing Large Steam Turbine Generator Department, Peters brought him to competitors' meetings. Similarly, in July 1957, McLane introduced his replacement, Lilly, to the conspirators.[67] Mauntel's participation on behalf of Westinghouse, which began at least in 1948, lasted until 1959; Whitescarver of GE continually attended meetings with competitors from 1941 through 1957; Miers of Allis was placed at com-

58. Compare PX 74 with PX 75.

59. PX 9, pp. 106, 120–22.

60. PX 4, p. 321; PX 5, pp. 87–91, 100; PX 8, p. 144; PX 9, pp. 44, 106; PX 16, p. 33; PX 17, pp. 21–22.

61. PX 7, pp. 35, 85; PX 13, p. 158; PX 16, p. 33.

62. PX 4, p. 74; PX 17, p. 21.

63. PX 4, p. 320.

64. PX 9, p. 45; PX 13, p. 158; PX 17, p. 21; PX 20, p. 30.

65. PX 3, pp. 34, 37, 44. Neblett was out of the turbine department from March 1943 to September 1944 and from April 1945 to July 1950. PX 138.

66. See note 15 supra.

67. PX 6, p. 78; PX 16, pp. 89, 203.

petitors' meetings from 1950 through 1958.[68]

■ Notwithstanding this evidence, defendants seek to fragment the conspiracy into pre-1954 and post-1954 portions contending that even if the evidence establishes collusion in the latter period, plaintiffs have not proved conspiracy at the time of their purchases. Although this argument raises certain evidentiary problems (discussed below) it otherwise lacks significance. One cannot read the deposition testimony by the conspirators about their activities until 1959 without inferring that this was a single conspiracy in effect for many years before and after 1954 (the evidentiary cutoff period urged by defendants) or 1952 (the date of plaintiffs' purchases). To a large extent, defendants' argument rests on plaintiffs' failure to present as microcosmic an analysis of the earlier years as they did for the ensuing years. However, the details of the conspiracy, as it existed after 1952, so dovetail with what we know of the pre-1952 activities that it is most logical to infer that only the unavailability of many of the early conspirators and the faulty recollections of those who testified [69] prevented plaintiffs from painting a similarly detailed picture about the previous years. Equally unimpres-sive is defendants' contention that evidence of meetings involving employees connected with pricing of medium or small, rather than large, turbines is insignificant.[70] The record demonstrates, for example, that representatives of these different sizes of turbines frequently participated in the same meeting; more importantly, the high ranking conspirators—e. g., Warren, Ginn, Eikner, Miers —were, in their own companies, responsible for varying sizes of turbines.[71] The conspiracy cannot, therefore, be fragmented by kilowatts, and this evidence is probative of a conspiracy affecting large turbines.

The following is an outline of the workings of the conspiracy after 1952 until its end in 1959. In early 1953, GE published a new price book which raised prices by ten per cent and introduced complex adjustments in pricing methods. Thereafter, Neblett and Peters of GE met with Mauntel and Eikner of Westinghouse and Miers of Allis to explain the new book.[72] Although defendants minimize the significance of this meeting by characterizing it merely as an explanation of certain handbook terminology, Eikner testified that the information was necessary to enable Westinghouse to "determine the same book prices that GE would determine from that price book." [73]

---

68. PX 3, pp. 19–20; PX 7, pp. 93, 109–10; PX 9, p. 28; PX 150, 153, 165.

69. E.g., Canschird and Kerr, who were identified as conspirators during the 1940's, died before they could be deposed, Tr. p. 2491; PX 9, p. 112; Miers, who was placed at meetings from 1950 to 1958, died in 1961 according to Nairn. PX 22, p. 17. Mauntel, at his deposition, suffered from diminution of memory, PX 7, p. 69.

70. It is interesting to note that the GE jurisdictional line between large and medium turbines constantly changed from 11,500 kw in 1947 to 100,000 kw in 1959. PX 175, p. 12. Classification also differed between GE and Westinghouse. Compare PX 175, p. 12 (GE medium turbines in 1956 were 2,500–50,000 kw) with PX 20,

p. 10 (Westinghouse medium turbines in 1956 were 7,500–100,000 kw).

71. The following are illustrative references to meetings involving personnel with authority over turbines of varying sizes: PX 4, pp. 241, 323–24; PX 10, pp. 94–95; PX 20, pp. 34, 37. As to the broad authority of Ginn, see PX 4, p. 58; Warren, PX 15, p. 18; Eikner, PX 7, p. 7; Miers, PX 22, pp. 17–18, 34.

72. PX 3, pp. 6, 8; PX 4, pp. 89–91; PX 11, p. 59.

73. PX 11, p. 66; Tr. pp. 2515–16, 2519. It is significant that in 1963, after GE had announced extensive revision of handbook prices, Westinghouse was able to figure out the changes "in a relatively few days" without assistance from GE personnel. Tr. pp. 2423–24.

The next significant meeting took place in New York City in early 1955. In the latter part of 1954, turbine generator sales had been made at increasingly large discounts off book—during what has been referred to in this case as the "white sale." Neblett explained how this meeting among competitors brought about increased prices:

> It was very simple. The meeting was arranged and Mr. Warren [GE General Manager, Turbine Division] made the statement to Mr. Mauntel and everybody present that we were going, or rather we had gone and were going to maintain prices very close to the handbook.

When asked how representatives of the other companies reacted to this announcement of GE, Neblett replied: "To the best of my knowledge, * * * they said 'Thank God'." [74]

There were other competitors' meetings in this year at which time the competitors discussed bids on upcoming TVA jobs. The anti-competitive effect of such prebid discussion is indicated by Eikner's testimony, even though couched in competitive terms, about why Westinghouse wanted these meetings:

> We were very much interested in trying to get the order for those machines. There were, as I recall, some questions in the interpretation of the specifications. We felt we could improve our chances of being competitive on the job if we could review book prices with the General Electric Company. [75]

On one occasion Neblett told his competitors that GE intended to bid about two per cent off book on the TVA–Johnsonville job. [76] It was agreed that GE would get "position" on this job and, in fact, GE eventually got the order. [77]

There were several meetings during 1956 on the subject of price increases. [78] In March 1956, Peters and Neblett of GE met with Mauntel and Eikner of Westinghouse and representatives of Allis to debate the amount of a proposed price increase—Neblett of GE favoring a ten per cent increase, Westinghouse favoring a rise of only five per cent. [79] Thereafter, GE did institute a ten per cent increase in April 1956, and Westinghouse and Allis did likewise immediately thereafter. [80]

There were many meetings during 1957, and the record discloses a great deal of discussion that year of individual jobs; [81] there was also some discussion about standardizing price books in terms of equalizing cost to the customer of large and small turbines. [82] Meetings in 1958 and early 1959 followed a similar pattern with general price levels and individual transactions the subjects of discussion. [83]

As in earlier years, these meetings and price discussions were accompanied by uniform price book movements. Effective March 30, 1953, GE increased handbook prices approximately ten per cent. Westinghouse put a similar increase into effect on April 10, 1953. Allis, in April 1953, instituted what it thought was the same increase, but later realized that its flat ten per cent price raise was not the same as its competitors' selective increases. So, on June 30, 1953, Allis made effective new price sheets sent out August

74. PX 3, p. 10.

75. PX 11, p. 68.

76. PX 3, pp. 44, 45; PX 4, pp. 100–02, 240.

77. PX 11, p. 70.

78. PX 4, pp. 120–30; PX 20, pp. 94–95.

79. PX 4, pp. 120–30.

80. PX 4, p. 130; cf. PX 4, p. 154.

81. E.g., PX 4, pp. 62, 153–54, 162, 174; PX 18, pp. 32, 61–62, 78.

82. E.g., PX 4, pp. 149–51.

83. E.g., PX 4, pp. 67, 228, 240–41, 274, 287; PX 6, pp. 294, 297; PX 10, pp. 93–99; PX 11, pp. 89, 96; PX 17, p. 11.

25, 1953, to adjust its prices in the same manner and amounts specified in the GE price sheets.

Effective January 3, 1955, GE adjusted handbook prices on large steam turbine generators in varying amounts averaging approximately two per cent. Following this GE book price change, Westinghouse made adjustments in book prices for various units effective February 10, 1955, consisting of increases and decreases of approximately two per cent or less; Allis did the same effective May 15, 1955. This pattern continued until the conspiracy ended.[84] It is sufficient to indicate that on at least seven later occasions, GE book price changes were closely followed by identical or highly similar changes in the price books of Westinghouse and Allis.[85]

The record is replete with admissions by the conspirators that their purpose in going to competitors' meetings was to stabilize prices as close as feasible to the published book prices.[86] For example, Jenkins of Westinghouse testified: "That was what I went to every meeting for * * * to try to bring order prices closer to book prices. I tried to sell turbines the best I could."[87] The testimony of Peters of GE, covering meetings from 1956 on, is equally illustrative:

Q: [I]n substance, in principle, your objective was to keep order prices as close to book prices as you could?

A: That's true.

Q: That was Westinghouse's position also?

A: What do you mean that was Westinghouse's position?

Q: That you should quote your order prices as close to book prices as possible.

A: Yes, we all believed that we should quote as close to book.

The Court: That idea was discussed and expressed at your meeting?

The witness: That's correct.[88]

Finally, the Allis viewpoint as expressed by J. W. McMullen, Vice President and General Manager, Power Equipment Division:

Q: Wasn't your purpose in participating in these competitors' meetings to stabilize prices and to try to get market prices up to book?

A: I would say that practically all of the meetings that I ever attended, so-called competitors' meetings, were along those lines.[89]

The "going level" of general market prices was established at three to five per cent off the book price, and one conspirator characterized larger discounts as "unhealthy" or a deterioration of prices in the market place.[90] Although there were general understandings that prices would be kept within the three to five per cent range according to the "rules being played,"[91] there are indications that GE, the company with the greater share of the market, occasionally had to resort to veiled threats of large discounts in order to keep the other conspirators in line. For example, McMullen, at his deposition, stated that he had "no reason to doubt the accuracy" of his grand jury testimony:

[H]istorically General Electric people used to make statements to

84. PX 25, 28.

85. Ibid. See PX 71.

86. E. g., PX 5, pp. 276–77; PX 11, p. 173; PX 13, pp. 160, 164; PX 17, p. 96; PX 19, pp. 39–40.

87. PX 20, p. 149.

88. PX 6, p. 277. Whitescarver of GE, who began attending meetings in 1941, gave similar testimony. PX 9, p. 65.

89. PX 13, p. 164.

90. PX 23, p. 80; PX 17, pp. 94–95, 231.

91. PX 10, p. 98; PX 12, p. 557; PX 14, pp. 90–92; PX 23, pp. 105, 116–17.

the effect that, well, if you are not interested in quoting book prices or establish[ing] book prices, the whole market would be lowered to some level that was being established by someone else. * * * I think Mr. Ginn mentioned that their company would either have to bring the level down to within 15 or 20 per cent if people did not adhere to the established market prices.[92]

On other occasions, the conspirators discussed specific jobs, frequently in terms of certain percentages off book.[93] At these discussions, the competitors decided which of them was to get "position." In almost every instance, the person with position—the one offering the lowest price—agreed to bid at a price very close to book.[94] In one case, designation of position was made by a drawing out of a hat, and the award was made to a manufacturer not even present.[95]

■ The relationship between book and order prices during and after the conspiracy supports the view that minimization of discounts was an important objective of the conspiracy. The relationship between book and order prices will be discussed in further detail below (Part III of this opinion). For present purposes, it is sufficient to record that from 1948 until the end of 1954, on a quarterly basis, the average order prices of steam turbine generators in excess of 100,000 kilowatts were rarely at discounts off book in excess of five per cent.[96] At the end of 1954 and in early 1955, the so-called "white sale" occurred and the average discount doubled.[97] A meeting was held to reestablish adherence to book prices.[98] Thereafter, the drop in order prices quickly halted; within a year the discount off book was again just about five per cent.[99] Defendants make the argument that adherence of book to order prices could not have been the object of the conspiracy because those who attended competitors' meetings lacked pricing authority. The record, however, is to the contrary, and shows, for example, that during all relevant periods, Peters, Neblett, Whitescarver, Mauntel, Sellers and other major conspirators had pricing responsibilities.[100] Moreover, the lesser conspiratorial lights represented those who had final pricing authority.

After exposure of the conspiracy, those responsible for establishing book price considered these post-conspiratorial prices to be "realistic," and GE salesmen were instructed to bid at book or very close to book.[101] Nevertheless, with competition reinstated, the order prices for large steam turbine generators after the end of the conspiracy reflected average discounts up to five times as great as those prevailing in the earlier period. Significantly, from 1950 to 1953, Allis's share of the market declined from seven per cent to zero, but it did not reduce book prices or generally offer large discounts off book; yet when collusion ceased and Allis's share of the market was again about seven per cent, it increased discounts off book drastically to take business away from its competitors.[102]

92. PX 14, pp. 40–41. The evidentiary problem raised by use of grand jury testimony will be discussed below. See PX 23, pp. 81–85.

93. PX 21, p. 64.

94. PX 6, p. 100; PX 9, pp. 176–77, 231; PX 18, pp. 57–59; PX 20, pp. 104–06.

95. PX 10, pp. 88–89; PX 20, pp. 114, 198–99.

96. PX 72.

97. Ibid.

98. See text accompanying note 74 supra.

99. PX 72, 72A.

100. PX 3, p. 36; PX 4, p. 8; PX 7, p. 10; PX 10, p. 17; PX 136, 138.

101. PX 187, 190, 191. See also text accompanying notes 127–31 infra.

102. Tr. pp. 2644–46; PX 72, 72A, 206. Similarly, despite market fluctuations in the period up to 1959, Peters of GE never recommended a price cut. Tr. pp. 3867–68.

Thus, the testimony as to meetings and the behavior of prices since 1948 inescapably lead to the conclusion that a conspiracy to set and maintain steam turbine generator prices at a high level existed throughout the period up to 1959, and specifically in 1952. It is interesting that the testimony of defendants' own economic expert, Dr. Morris A. Adelman, supports this conclusion.[103] In response to questions by the court, Dr. Adelman stated very definitely that the competitive price of an OVEC-type unit from 1952–1954 should have decreased by over $600,000.[104] When it was called to his attention that industry prices during that period actually went up, Dr. Adelman answered that for this period "I would have to presume that I couldn't explain it or I would have to conclude that I couldn't explain that movement by competitive supply and demand."[105] Moreover, during the course of explaining other calculations, Dr. Adelman testified that he eliminated certain data about prices from 1957–1959. He thus explained his reason for doing so:

> I think the rest of the prices are explained approximately by competitive supply and demand. I think this study of prices is not to be so explained.[106]

On cross-examination, Dr. Adelman agreed this data would be "compatible" with conspiratorial activity.[107]

Although not necessary to the conclusion of collusion, it should be noted that, in addition to the previously outlined evidence, the record contains various admissions by the defendants that their employees had participated in price fixing activities. For example, in answers to interrogatories filed in this court, GE admitted that Whitescarver, Peters, Lilly, Lawson and McLane met with competitors at various times from 1957–1959.[108] In a similar document, Westinghouse admitted similar participation by Eikner, Morgan and Jenkins.[109]

■ Defendants contend that the negotiations leading up to the transactions in suit effectively refute the existence of conspiracy. They argue that if, as plaintiffs contend, the conspiracy was effective, Sporn, notwithstanding his skill as a negotiator, would not have been able to obtain price concessions by playing one company off against the other. However, Sporn's ability to obtain concessions off a list price is in no way inconsistent with a conclusion that the list prices were conspiratorially established. As the court in Plymouth Dealers' Ass'n v. United States, 279 F.2d 128, 132 (9th Cir. 1960) recognized, this activity alone is prohibited.

> The competition between the Plymouth dealers and the fact that the dealers used the fixed uniform list price in most instances only as a starting point, is of no consequence. It *was* an agreed starting point; it had been agreed upon between competitors; it was in some instances in the record respected and followed * * *; it had to do with, and had its effect upon, price.

> The fact that there existed competition of other kinds between the various Plymouth dealers, or that they cut prices in bidding against each other, is irrelevant.

The spirit of United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222, 60 S. Ct. 811, 844, 84 L.Ed. 1129 (1940) is in accord, for, as the Supreme Court stated, "prices are fixed * * * if the range

---

103. However, the testimony is not necessary to the finding of collusion or relied upon for reasons indicated below.

104. Tr. pp. 4786–90.

105. Tr. p. 4790.

106. Tr. p. 4409.

107. Tr. p. 4435.

108. PX 172; cf. PX 24, 194, 195.

109. PX 173.

within which * * * sales will be made is agreed upon * * *."

Finally, certain portions of the negotiations in fact lead to inferences that GE and Westinghouse did engage in collusion. It will be recalled, for example, that GE, after having given a price per unit based on an order of six units, refused to consider a lower price per unit even on the basis of an order for eleven units, even though GE was "in a position to produce all eleven machines." [110] This intransigent position, articulated for GE by Neblett, an early and then active conspirator, might signal the presence of anti-competitive influences in the negotiations.

To recapitulate, plaintiffs have proved that employees of GE, Westinghouse, Allis and others who had pricing responsibility met from 1939 until 1959 to discuss the large steam turbine generator business in a manner completely antithetic to effective competition. There is no direct evidence that the OVEC and IKEC transactions were discussed among competitors. Nevertheless, among other things, the nature and times of the competitors' meetings, the parties involved, the subjects discussed, the uniform pricing policies evident throughout the period up to 1959, and the sharp increase in discounts off book thereafter all lead to the conclusion that defendants conspired in the early 1950's to affect the level of prices for all large steam turbine generators. Specifically, the purpose of the conspiracy was to establish uniform book prices and to maintain order prices as close as possible to book. Thus, the evidence clearly establishes the existence, among defendants and others, of a conspiracy "in restraint of trade" within the meaning of section 1 of the Sherman Act prior to, during and after the period of the purchases in suit.

*Fraudulent Concealment*

■ Defendants assert that under section 4B of the Clayton Act, 15 U.S.C. § 15b, plaintiffs' claims of overcharge in 1952 on the transactions in suit were barred by the end of 1956 unless prior to that time defendants had fraudulently concealed from plaintiffs the existence of the conspiracy. That such concealment would toll the statute was established in this circuit by Atlantic City Elec. Co. v. General Elec. Co., 312 F.2d 236 (2d Cir. 1962), cert. denied, 373 U.S. 909, 83 S.Ct. 1298, 10 L.Ed.2d 411 (1963). Every other circuit court that has considered the problem has reached the same conclusion.[111] Defendants argue, however, that plaintiffs have failed to establish fraudulent concealment.

■ Examination of the record discloses abundant proof that defendants affirmatively and deliberately concealed the existence of the conspiracy. The conspirators concealed their activities from their customers, the government, and officers and employees of defendants who did not participate.[112] To achieve and preserve secrecy, the conspirators falsified their expense accounts to hide the true nature and purpose of their meetings and trips,[113] made telephone calls at night from pay telephones rather

110. Tr. pp. 485–86, 511–12; PX 49. The total kilowatt generating capacity of the OVEC and IKEC turbines (2,389,860 kilowatts) represented about 22% of total kilowatts ordered by utilities in 1952. Had GE received orders for the additional five units, its sales would have increased by about 16%. See text accompanying note 12 supra; PX 346.

111. General Elec. Co. v. City of San Antonio, 334 F.2d 480 (5th Cir. 1964); Westinghouse Elec. Corp. v. City of Burlington, 326 F.2d 691 (D.C.Cir. 1964) (per curiam); Westinghouse Elec. Corp. v. Pacific Gas and Elec. Co., 326 F.2d 575 (9th Cir. 1964); Allis-Chalmers Mfg. Co. v. Commonwealth Edison Co., 315 F.2d 558 (7th Cir. 1963); Public Serv. Co. v. General Elec. Co., 315 F.2d 306 (10th Cir.), cert. denied, 374 U.S. 809, 83 S.Ct. 1695, 10 L.Ed.2d 1033 (1963); City of Kansas City v. Federal Pac. Elec. Co., 310 F.2d 271 (8th Cir.), cert. denied, 371 U.S. 912, 914, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962).

112. E.g., PX 24, p. 295; PX 171, p. 17703.

113. PX 4, p. 258; PX 16, p. 116.

than from their offices,[114] destroyed notes taken at conspiratorial meetings,[115] and instructed newcomers to the conspiracy not to divulge its existence.[116] The effectiveness of this concealment was admitted by GE's Chief Executive Officer in a speech at the University of Chicago in 1961, as follows:

> The members of this conspiracy went to great lengths to conceal their activities from those charged with assuring compliance with the Company's Directive Policy. The concealment was highly effective, much more so than would be supposed from the comic-opera description in some publications. It took eighteen months of government investigation, including access to competitive information, and more than 500 witnesses appearing before four separate Grand Juries to uncover the facts. Certainly, there is no excuse for such deception.[117]

Defendants do not claim that plaintiffs knew or should have known of the conspiracy; [118] nor, apparently, do they dispute that the affirmative acts of concealment referred to above occurred. Defendants do claim that "the acts relied on do not constitute a fraud as to plaintiffs. * * * [N]o such acts were related to plaintiffs." [119] Therefore, according to defendants, there was present here no more than "mere silence" on the part of defendants, see Gaetzi v. Carling

Brewing Co., 205 F.Supp. 615, 619–621 (E.D.Mich.1962), which is not sufficient to toll the statute.

Assuming that plaintiffs must prove more than "mere silence" by defendants—an assumption which in an antitrust conspiracy case may not be correct[120]—the acts proved satisfy this requirement. Defendants insist on proof of acts "related to plaintiffs," arguing that:

> Plaintiffs' knowledge or understanding of any conspiracy would not have been aided if all names had been noted on expense accounts, if telephone calls had been made during the day rather than at night or from office telephones rather than from home or pay telephones, or if notes utilized at competitors' meetings had been retained and even memorialized in corporate files.[121]

However, it is quite possible that if the conspirators had not engaged in these acts and had not instructed newcomers to keep the conspiracy secret plaintiffs' knowledge of the conspiracy might have been aided. In some of the cases cited by defendants, there is language that something akin to direct misrepresentation to a plaintiff is necessary to toll the statute,[122] and it may be that defendants are urging that position as well. However, such restrictive interpretations of the doctrine of fraudulent concealment

---

114. PX 4, p. 73.

115. PX 22, p. 216.

116. PX 4, p. 39.

117. PX 104, p. 5.

118. Tr. pp. 530–33.

119. Defendants' Post-Trial Brief and Proposed Findings and Conclusions (hereinafter cited as "Def. Post-Trial Brief"), p. 72.

120. See Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80, 87, 90 A.L.R.2d 252 (2d Cir.), cert. denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961):
> Even if no affirmative act of concealment is required in restraint of trade conspiracy cases, see Dawson [Fraudulent Concealment and Statutes of Lim-

itation, 31 Mich.L.Rev. 875 (1933)] at 880, 907–08; American Tobacco Co. v. People's Tobacco Co. [204 Fed. 58 (5th Cir. 1913)]; cf. 63 Harv.L.Rev. at 1221, in contrast to the usual rule when there is no fiduciary relationship, a point we do not decide * * *.
> But see Atlantic City Elec. Co. v. General Elec. Co., supra at 240–241, n. 9.

121. Def. Post-Trial Brief, p. 73.

122. Laundry Equip. Sales Corp. v. Borg-Warner Corp., 334 F.2d 788, 790 (7th Cir. 1964) (dictum, since trial judge found that plaintiff "knew or should have known" of the cause of action); Burnham Chem. Co. v. Borax Consol., Ltd., 170 F.2d 569, 574 (9th Cir. 1948) (state law applied).

are hardly required by the cases,[123] and negate the policy behind the doctrine.[124] I conclude that, at the very least, acts concealing the conspiracy by participants therein toll the statute, a position in accord with Gaetzi, one of the cases principally relied upon by defendants. Accordingly, I find that defendants fraudulently concealed from plaintiffs the existence of the conspiracy so that section 4B of the Clayton Act was tolled.

## III

Suit may be brought under section 4 of the Clayton Act, 15 U.S.C. § 15 by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws * * *." The parties agree that, in order to recover here, plaintiffs must do more than prove violation of the antitrust laws by defendants. They must also prove that they have been "injured in * * * [their] business or property" and the extent of such injury, if any. Defendants argue that (1) plaintiffs have not proved that there were overcharges on the OVEC and IKEC units and, (2) even if there were, plaintiffs sustained no damages because the overcharges were, or will be, "passed-on" to others, principally the AEC.

■ Defendants stress the distinction between "impact" and "damages" in an antitrust case, characterizing the former as the fact of damage and the latter as the amount. Defendants argue that the burden of proof as to impact is "more stringent" than as to damages, see Flintkote Co. v. Lysfjord, 246 F.2d 368, 392 (9th Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), and has not been satisfied in this case. Whatever consequences may flow from this distinction between impact and damages in other antitrust situations, the issues are essentially the same in a price fixing case; the question is to what extent, if any, has a purchaser paid more for a product than he would have paid had there been no conspiracy. In Chattanooga Foundry and Pipe Works v. City of Atlanta, 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906), the Supreme Court (per Holmes, J.) stated:

> [Plaintiff] was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe. A person whose property is diminished by a payment of money wrongfully induced is injured in his property.

In other words, in a price fixing case, impact and damages are coextensive; the overcharge constitutes the plaintiff's injury (impact) as well as the measure of his damage (damages) and is the difference between the price actually paid and the price he would have paid absent the conspiracy.

■ While plaintiffs do not explicitly address themselves to defendants' argument that there is a greater burden in proving "impact," they say that the distinction in this case is meaningless. Plaintiffs assert that their burden is not to prove the extent of pecuniary loss to a certainty but only to introduce evidence permitting the trier of fact to estimate the damages as a matter of just and reasonable inference. They cite Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563–565, 51 S. Ct. 248, 250–251, 75 L.Ed. 544 (1931), where the Supreme Court stated that the basis for this rule as to burden of proof is the principle that no one may profit from his own wrong:

> Where the tort itself is of such a nature as to preclude the ascertain-

---

123. Cf. Holmberg v. Armbrecht, 327 U.S. 392, 396–397, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Public Serv. Co. of N. M. v. General Elec. Co., 315 F.2d 306, 310 (10th Cir.), cert. denied, 374 U.S. 809, 83 S.Ct. 1695, 10 L.Ed.2d 1033 (1963). See also note 120 supra.

124. Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874).

ment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

\* \* \*

\* \* \* \* \* \*

"To deny the injured party the right to recover any actual damages in such cases, because they are of a nature which cannot be thus certainly measured, would be to enable parties to profit by, and speculate upon, their own wrongs, encourage violence and invite depredation. Such is not, and cannot be the law, though cases may be found where courts have laid down artificial and arbitrary rules which have produced such a result."

\* \* \* \* \* \*

" \* \* \* There is no sound reason in such a case, as there may be, to some extent, in actions upon contract, for throwing *any part* of the loss upon the injured party, which the jury believe from the evidence he has sustained; though the precise amount cannot be ascertained by a fixed rule, but must be matter of opinion and probable estimate. And the adoption of any arbitrary rule in such a case, which will relieve the wrongdoer from any part of the damages, and throw the loss upon the injured party, would be little less than legalized robbery.

"Whatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced. \* \* \* " (Emphasis by the Court.)

Similarly, in Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–265, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946), the Court stated:

In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances "juries are allowed to act upon probable and inferential, as well as direct and positive proof," \* \* \* Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. \* \* \*

See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

■ Characterizing this as a "loose standard of proof," defendants argue that it can be applied only after the fact of damages has been independently established, which they claim was done in

each of the cited cases.[125] Whether on the facts of this case this battle really amounts to anything need not be decided. Under the "more stringent" test of impact urged by defendants, plaintiffs "must establish with 'reasonable probability' the existence of some causal connection between defendants' alleged wrongful act and plaintiffs' injury."[126] Under this test, plaintiffs have clearly met their burden so that further discussion of the burden of proof standard is unprofitable.

*Plaintiffs' Discount Off Book Theory*

The core of plaintiffs' case is a comparison of discounts off book for steam turbine generators in the period prior to mid-1959, when the conspiracy terminated, with the April 1961 to December 1963 period, when prices had fairly well stabilized after the shock of exposure of the conspiracy. Plaintiffs' theory breaks down into four propositions: (1) the book prices in the periods being compared served the same function and are therefore properly comparable; (2) while the conspiracy was in effect, discounts from book price were small; (3) after its end, discounts were large as order prices sagged precipitously away from book; and (4) the measure of the conspiracy's effect, therefore, is the large gap between order and book prices after the conspiracy was uncovered as contrasted with the small gap which previously existed. Plaintiffs' proof as to activity of both book and order prices was introduced principally through Dr. John M. Firestone, a statistician who studied price data in the relevant periods.

As to proposition (1), it is plaintiffs' contention that book prices both during the conspiracy and during the 1961–1963 reference period were intended to be prices actually realizable in the market place. Defendants contest this and argue that whatever meaning book prices had in a period of rising prices, such as 1952–1954, they had a completely different significance when prices were falling post-1959. They claim that in the earlier period a book price was meant to be an offer to sell and generally a realistic appraisal of the market level at which a transaction might ultimately be consummated. On the other hand, according to defendants, in the 1961–1963 reference period used by plaintiffs, both manufacturer and buyer knew that book prices were not designed to reflect a realistic appraisal of what a unit was worth. The record, however, does not support defendants. When defendants dropped book prices in the post-1959 period and issued new book prices in October 1959 and in March 1961, they regarded the new quotations as realistic anticipated sales prices, as they had regarded the earlier price books. Thus, in February 1961, shortly before the March increase, GE's pricing personnel for large steam turbine generators decided that "new quotations would be made at book price and prices would not be negotiated below this level."[127] This conception of book price did not differ from that evidenced at a GE marketing managers' meeting in July 1953, about which Peters testified:

Q: In paragraph 4 of PX 316 you refer to the following conclusion at the meeting, "Realistic handbook prices should be established for all products sold to the utilities market and the

---

125. Def. Post-Trial Brief, pp. 21–22. E.g., in Story Parchment Co. v. Paterson Parchment Paper Co., supra 282 U.S. at 562, 51 S.Ct. at 250, the Court said:
It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount.

126. Def. Post-Trial Brief, p. 19.

127. PX 190, p. 2; see also PX 185, 187, p. 3; PX 191, p. 1; PX 251, p. 4.

market prices should be reasonably close to the published handbook price levels." Am I correct that by "realistic handbook prices" you meant handbook prices that could actually be obtained on products sold?

A: That is correct. The handbook prices should be close to the market prices at that time.[128]

Sales under the July 1959 book reveal both that GE thought that book "realistic" and that competitors for the first time in years were providing surprises. For example, in two bids placed under that book GE bid book price and two per cent off book, and Westinghouse bid thirteen per cent and fifteen per cent off book, respectively; Westinghouse was awarded both jobs.[129] It is true that the price book changes announced by defendants in 1963 represented a change in policy in the use of these books, since they were accompanied by an expressed intention to quote discounts of twenty-four per cent off book.[130] This clearly negates any characterization of this later book price as "realistic." It is for this reason, among others, that plaintiffs chose for comparison purposes the price book in effect commencing in the spring of 1961.[131] Plaintiffs are comparing this book with the 1952 book to establish damages. Since these books served the same function, defendants' objections to this comparison is unsound.

■ The record supports plaintiffs' second proposition. In the period from 1948 to mid-1959, the book prices of GE, Westinghouse and Allis for units of ten megawatts and over sold to utilities and governmental agencies ("all units") rose steadily and, except for minor variations, in approximately the same amounts.[132] In the same period, the average discount off book given to buyers for all units was generally small. The average discount for all units from the first quarter of 1949 to the second quarter of 1959 was less than five per cent, and the greatest average discount for any quarter from 1948 to the first quarter of 1959 for all units was 10.3 per cent during the "white sale" in the first quarter of 1955.[133] In the years 1952 and 1953 particularly, discount off book averaged less than five per cent.[134] Therefore, in the period when the conspiracy was in operation, average order prices on units sold hovered close to book,[135] and this was also true of cross-compound units (the type here involved), although the sales of these, much fewer in number, were not as close to book as the others.[136] The record is overwhelming that this result was not achieved by chance, since a primary aim of the conspiracy was to keep order prices as close as possible to book.[137] Therefore, plaintiffs' second proposition —that order prices stayed remarkably close to book price during the conspiracy —is borne out by the evidence.

■ As to proposition (3), in the period after July 1959, book and order prices both began a steady decline. In July 1959, each manufacturer reduced its book price, and these book prices remained in effect until October of that year. At that point, the manufacturers

---

128. Tr. p. 3823.

129. PX 89. See also PX 189, p. 4, referring to "first indication of drastic AC [Allis] price cutting of approximately 17–20%" in the same period.

130. PX 25, p. 9.

131. The comparison period is April 1961—December 1963. Although GE's new price book policy was announced on May 20, 1963, there is apparently no serious dispute that sales until the end of 1963 continued under the old book. Westinghouse did not change its book until December 1963. Ibid.

132. PX 25, 28.

133. PX 72A, 84.

134. PX 72A.

135. PX 72, 74, 75, 77, 78, 79.

136. PX 72, 72A, 73, 73A, 80, 80A.

137. See notes 64, 74, 86–99, supra, and accompanying text.

lowered their book prices an average of five per cent.[138] These book prices continued until 1961. In March 1961, GE reduced its book price by 12.5 per cent and Westinghouse did the same in April.[139] In May 1963, GE substantially revised its handbook prices and announced a new price policy under which GE would quote twenty-four per cent off the new handbook prices to all customers. Westinghouse did the same in December 1963.[140] Although book prices declined steadily in the post-1959 period, order prices declined even more, and the level of the market in terms of discount off book dropped sharply. Thus, from a range of up to 10.3 per cent in the pre-1959 period, average discounts by quarter for all units in the post-1959 years went as high as 36.5 per cent in the first quarter of 1961.[141] The average discount off book for the period from July 1959 to December 1963 was 26.9 per cent.[142] During the period between 1959 to 1963, inclusive, the average discount, respectively, was 15.2 per cent in the third and fourth quarters of 1959, 25.1 per cent in 1960, and 30.3 per cent, 29.4 per cent, and 28.9 per cent in succeeding years.[143] There is no doubt that the margin between book and order prices, which had been small in the pre-1959 period, widened dramatically after exposure of the conspiracy in 1959. Thus, plaintiffs' third proposition is also demonstrated by the record.

Finally, plaintiffs urge that since the conspirators aimed to, and did, keep order prices close to book, the difference in discount after exposure in 1959 is a true measure of the overcharges before 1959. Taking figures provided from defendants' own computer tabulation, the record shows that cross-compound units were sold in the post-conspiratorial measuring period at an average of 25.33 per cent off book.[144] By limiting the comparison in April 1961—December 1963 to cross-compound units only, plaintiffs cannot be accused of searching for the highest comparable figures. Indeed, comparing instead the average discount in this period for all units, or for all units one hundred megawatts and over, results in higher comparable discounts, 27.99 per cent and 28.87 per cent, respectively.[145] Plaintiffs point out that by using as a measuring rod only the *average* discount in the post-conspiratorial period, they are being conservative, since AEP, with its potential buying power, could be expected to obtain more than the average discount.[146] In 1952, plaintiffs did, of course, receive an approximate eleven per cent discount which was almost double the average discount for that quarter.[147] Plaintiffs claim that in the absence of conspiracy in 1952, they would have received at least the same discount on each of the eleven cross-compound units as the average discount of 25.33 per cent granted by defendants for cross-compound units during the non-conspiratorial reference period.

By applying this average discount of 25.33 per cent to the book price under which they purchased, plaintiffs arrive at a price which they assert defendants would have charged them if no conspiracy had existed. The difference between the price using the non-conspiratorial discount and the actual order price is the amount of the claimed overcharge on each purchase in suit. This computation results in damages totaling $5,283,-397 on the seven units purchased from GE, and $2,884,376 on the four units purchased from Westinghouse, or a total of $8,167,773.

138. PX 25, pp. 7–8.

139. Id. at 8.

140. Id. at 9.

141. PX 72, 72A.

142. PX 70.

143. Tr. pp. 1083–84; PX 84.

144. Tr. pp. 1030–36; PX 68.

145. PX 69.

146. Cf. PX 214.

147. PX 72A.

The breakdown is as follows:[148]

| | General Electric | Westinghouse | |
|---|---|---|---|
| **PER UNIT** | | | |
| Final Order Price | $4,718,255 | $4,750,000 | |
| Own Book Price | $5,308,000 | $5,395,615 | |
| Non-Conspiratorial Discount | | 25.33% | |
| Non-Conspiratorial Price | $3,963,484 | $4,028,906 | |
| Overcharge | $ 754,771 | $ 721,094 | |
| **IKEC** | | | |
| Overcharge per Unit | $ 754,771 | | |
| Total Overcharge | $4,528,626 (6 units) | | |
| **OVEC** | | | |
| Overcharge per Unit | $ 754,771 | $ 721,094 | |
| Total Overcharge | $ 754,771 (1 unit) | $2,884,376 (4 units) | |
| **TOTALS** | | | |
| Overcharges | $5,283,397 | $2,884,376 | $8,167,773 |

Defendants do not seriously dispute either that discounts hovered close to book during the conspiracy and dropped sharply thereafter or the arithmetic leading to the measuring rod of 25.33 per cent.[149] Defendants do sharply question the validity of plaintiffs' discount off book damage theory, claiming for a number of reasons that the comparison between the two periods is invalid. They argue first that the relationship of order price to book, or discount off book, as a means of reconstructing an assumed competitive price is meaningless. Defendants assert that sales were made in the trade not in terms of discount off book but with reference to dollars charged per kilowatt. However, the record is replete with testimony and documents showing that defendants' own personnel consistently studied individual transactions and market levels in terms of the per cent off book granted in a particular sale.[150] One of GE's pricing personnel stated of discount off book: "That is how we sold most jobs. They were negotiated that way."[151] Most significantly, discussions at competitors' meetings were in terms of discounts off book.[152] In the negotiation of the eleven units sold to plaintiffs, the concept of discount off book played a substantial role. As an example, in the early meetings between Sporn for plaintiffs and Warren for GE, there was "considerable discussion" of increasing a GE proffered concession of two per cent off book to 4.5 per cent and then to five per cent, as urged by Sporn.[153] Moreover, there is no question that in applying escalation under PETS clauses, defendants consistently used the discount off book concept.[154] Clearly, discount off book was a basic unit of measurement used by defendants

148. PX 68.

149. Tr. pp. 1370–71.

150. E.g., Tr. pp. 2539–43, 3815; PX 88, 95, 317.

151. PX 5, p. 391.

152. E.g., PX 10, pp. 98–99; PX 16, pp. 256–57; PX 19, p. 57; PX 23, p. 105.

153. PX 33, see also PX 32, 37.

154. PX 5, pp. 390–91.

in determining market levels and in negotiations.[155]

Defendants also urge that it is meaningless to compare discounts off book in periods when different levels of book price prevail. However, the testimony and contemporaneous business records make clear that discounts off book were used for comparison purposes by those buying and selling, even though the book prices were not at the same price level.[156] Thus, the very transactions in suit were analyzed in terms of discount off book in 1952 and 1954 by both sellers and buyers, even though a substantial book price increase had intervened.[157] Again, in 1956 GE analyzed sales for 1952–1955 in the following terms, although increases in book prices had intervened:

> In 1952 and 1953, 10% of the orders were received at book price and 70% were at 1½% or less. In the last half of 1954 and 1955 no orders were received at less than 1½% reduction.[158]

Similarly, in the post-1959 period, even though there were changes in book prices, those in charge of defendants' pricing policy analyzed what they regarded as the unfortunate activity of the market in this period by the continuing criterion of the widening gap between book price and order price.[159] It is true that Dr. Adelman stated that a comparison between discounts off book in different periods is "useless" as a measure of price change.[160] However, it is clear from his testimony that if additional facts were added to those upon which he based his comment, such as existence of a conspiracy, action of the market in the white sale, etc., the relationship of

book and order prices might acquire more meaning.[161] I conclude that the comparison made by plaintiffs is not vitiated because of changes in book price levels.

Defendants' most compelling objection to plaintiffs' comparison of the two periods is that different economic forces were at work in each period. These, according to defendants, included in the later period the presence of effective foreign competition for the first time, an increase in the manufacturers' capacity to produce steam turbine generators which caused an oversupply, a lessening of ordinary growth in demand, and a drop in manufacturing cost which allowed defendants to offer their products at a lower price. Much of the defendants' testimony was directed to these economic issues. Plaintiffs argue that the difference between the meager discounts off book in the pre-1959 period and the much larger discounts in the years immediately after is completely explained by the termination of the conspiracy. Plaintiffs point to the circumstances surrounding the end of the "white sale" in 1955, discussed above,[162] to support their position. At that time, when the conspirators began to undersell each other and the gap between book and order prices increased sharply, the trend was quickly reversed by a competitors' meeting. Another, but minor, aberration in relationship of book and order prices was similarly corrected in 1958 by a meeting of competitors which ended with "a meeting of the minds that all of the companies attending would quote at 2 or 3 per cent off book if everyone else did." [163] Plaintiffs also refer to the testimony of defendants' witnesses showing that defendants' pricing

---

155. Plaintiffs also argue that even if dollars per kilowatt were used as the measure of comparison, substantial damage has been shown. Plaintiffs' Post-Trial Brief, pp. 66–77. It is not necessary to deal with this contention.

156. Tr. pp. 2534–38; PX 65, 244, 245, 317.

157. Tr. pp. 3705–06; PX 5, pp. 390–91; PX 32, 33, 37.

158. PX 317, p. 2.

159. E.g., PX 65.

160. Tr. p. 4360.

161. Tr. pp. 4662–62a.

162. See text accompanying note 74 supra.

163. PX 23, p. 105; see also PX 10, pp. 98–99.

personnel attributed the post-1959 order price drop to competition alone.[164]

After a consideration of the entire record, it is my conclusion that plaintiffs' comparison theory stands up against this attack. It is true that there were economic differences between the 1952 and 1961–1963 periods, but not enough to render invalid use of discount off book to establish damages. In the first place, as indicated above, defendants themselves used discount off book in the latter period to compare current with earlier sales. Moreover, within the conspiratorial period up to 1959 the same economic forces did not prevail. Thus, demand fluctuated from time to time.[165] Yet, this did not prevent defendants' pricing personnel from using discount off book to compare market levels throughout these years.[166] In addition, book prices in all periods from 1948 to the end of 1963 (when the new concept of twenty-four per cent discount off book went into effect) were meant to take into account all of the economic variables on which defendants rely, such as changes in cost, competition, backlogs, etc.[167] While these book prices were undoubtedly, in view of the evidence, set at a much higher level than pure competition would have demanded, the essential point here is that in every period they were also meant to take account of economic forces, at least as appraised by pricing personnel. Therefore, the relationship between book and order prices in 1952 and 1961–1963 is a proper indicator of damages.

In addition to the factual and economic validity of plaintiffs' use of a discount off book theory to prove damages, there is ample legal precedent for proving damage by comparing economic conditions during a conspiratorial period with those before or after. In Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), plaintiff sued for profits lost due to defendant's illegal refusal to sell plaintiff photographic supplies. Damages were proved by showing plaintiff's gross profits on defendant's goods in the four years preceding the period in suit less certain expenses. In Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), defendants were found to have unlawfully combined to drive plaintiff out of business by keeping the price of parchment paper low. Plaintiff proved damages by comparing the difference between the prices at which it sold parchment paper before and after the conspiracy started. In Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), the charge was that defendant had conspired to withhold motion pictures from plaintiff owner of a movie theater. Plaintiff had two theories of damages: a comparison between earnings during the period of conspiracy and in the four years immediately prior to its inception, and a comparison of net receipts during the conspiracy with those of a competing theater which had obtained the films withheld from plaintiff. The Supreme Court, in affirming a jury verdict, stated (327 U.S. at 260, 66 S.Ct. at 578): "Each of the two classes of evidence introduced by petitioners tended to show damage." Defendants rely on Herman Schwabe, Inc. v. United Shoe Mach. Co., 297 F.2d 906 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct 1031, 8 L.Ed.2d 85 (1962) to support their argument that plaintiffs have failed to provide a satisfactory measure of their alleged damage. Plaintiff in Schwabe claimed damages because of United's unlawful use of tying clauses which allegedly prevented plaintiff from obtaining a share of the market for shoe machinery. The court held that plaintiff's evidence on damages was insufficient, but did suggest that proof of plaintiff's profit in the post-violation period when United had ceased its conduct

---

164. Tr. pp. 1548–52, 2421–23, 2576–77.

165. See, e.g., PX 346.

166. See notes 150, 156–58 supra and accompany text.

167. PX 5, p. 424; PX 190.

would have been satisfactory (297 F.2d at 910):

> Although, because of defendant's long domination of the market, plaintiff could not show how sales and profits once realized in a free market had diminished, no reason is seen why it could not have proceeded in the opposite direction, by showing how its sales and profits had waxed as United's unlawful practices had waned.

From all of this, it is apparent that plaintiffs' comparison theory of damages is sound, that the conspiracy up to 1959 prevented larger discounts which might have resulted from intentional price-cutting or inadvertent pricing errors,[168] and that the startling change in discounts off book after 1959 is attributable, at least in substantial part, to the end of the conspiracy and the resultant competition. I conclude that, in the period when defendants sold the eleven units to plaintiffs, book and order prices had been raised by the conspiracy, and plaintiffs paid a higher price than they would have paid had there been no conspiracy. The remaining key question is how much of an overcharge there was.

*Defendants' Economic Defense*

Defendants' major thrust at trial was on the issue of whether, assuming a conspiracy existed, it had any effect on the prices plaintiffs paid. To support the proposition that it did not, defendants offered the testimony of a number of employees and three experts: economists Dr. Morris A. Adelman and Dr. John J. Corson and Paul C. Yoke, a consulting engineer. Since Drs. Adelman and Corson concluded that collusion, if any, did not affect plaintiffs' purchase price, implicit in the findings immediately above is a rejection of this portion of their testimony.

Before analyzing the testimony of these two witnesses, a word must be said about one of defendants' arguments —that plaintiffs were not damaged because prices were higher in the post-conspiracy period than they were in 1952. It is true that actual turbine generator prices in plaintiffs' post-conspiratorial reference period were appreciably higher than when plaintiffs bought in 1952.[169] But it hardly follows from this observation that prices in 1952 would not have been lower with full competition. A decade had intervened with many economic forces at work, increased costs of labor and materials not the least among them.[170] The real issue is not whether the units purchased by plaintiffs would have cost more in 1962; it is whether they should have cost less in 1952.

Dr. Adelman's testimony was the capstone of defendants' case, since he offered a precise reconstructed competitive unit price in the fourth quarter of 1952 for the machines in suit of $5,225,000.[171] This figure is approximately $506,000 more per unit than the 1952 order price of the seven GE units and $475,000 more per unit than the order price of the four Westinghouse units. If this conclusion were accepted, then plaintiffs were not overcharged in the 1952 order price, but actually received a bargain. Dr. Adelman assumed collusive meetings were going on at the time, an assumption amply supported by the evidence (see II, supra). Therefore, acceptance of his conclusion as to a reconstructed price is tantamount to a finding that the conspirators were completely wasting their time at these meetings, since GE's book price for its units (after a pre-negotiation concession that a two per cent error in calculation had been made) was under the $5,225,000 reconstructed competitive price.[172] Such a finding flies in the face of common

---

168. Tr. pp. 2516, 2518–19, 4596–97.

169. Tr. pp. 1233–34, 1261; PX 80; GE 104 (indicating less of a percentage increase than PX 80). Plaintiffs argue, however, that average prices per kilowatt were actually lower after the con-

spiracy. Plaintiffs' Post-Trial Brief, p. 69.

170. See, e.g., PX 368.

171. GE 195A.

172. Tr. p. 457; PX 27, app. D.

sense; it is not ordinarily the case that sellers conspire to set prices below those realizable under non-collusive conditions. However, this is not the only, or even the most important, reason for rejecting Dr. Adelman's ultimate determination of the reconstructed competitive price. That figure was based upon a number of assumptions, some of which are unacceptable.

The basic premise of Dr. Adelman's testimony was that he could compare the direct cost of manufacture of a unit sold in the post-conspiracy period, allegedly similar to plaintiffs' units, with the average direct cost of plaintiffs' units and arrive at a ratio which could be applied to the price of the post-conspiracy unit to determine the reconstructed competitive price for plaintiffs' units. In making this computation, he made significant adjustments for assumed productivity changes and differences in utilization of capacity in the two periods.

■ At least two key assumptions upon which Dr. Adelman's testimony was based must be rejected. The first is the assumption that the actual average cost of plaintiffs' units can properly be used for precise comparison purposes. It has been pointed out that collusion inhibits the usual competitive desire to lower costs in order to increase profit. Thus, in United States v. Aluminum Co., 148 F.2d 416, 427 (2d Cir. 1945), Learned Hand noted:

> Many people believe that possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough alone. Such people believe that competitors, versed in the craft as no consumer can be, will be quick to detect opportunities for saving and new shifts in production, and be eager to profit by them.

The record here bears out the truth of this belief and indicates that the actual costs of plaintiffs' machines were higher than they would have been if price competition had been in effect and vigorous cost reduction had been pursued.[173] Thus, the conspirators' cost reduction efforts during the conspiratorial years were characterized by their own personnel as "half-hearted."[174] A GE memorandum accurately stated of these years that "manufacturers raised prices instead of improving productivity to recover their own cost increases."[175] Dr. Adelman readily conceded that his analysis did not take into account such cost inflation.[176] Moreover, because of this, unless many of the variables in Dr. Adelman's formula are changed, it produces an *increase* in assumed competitive price for every assumed *decrease* in the cost of plaintiffs' machines,[177] a concededly paradoxical result. This suggests that Dr. Adelman's formula is unworkable on the present record if it is assumed (and I so find) that under competitive, rather than collusive, conditions, the costs of manufacturing plaintiffs' units would have been materially less.

The second faulty key assumption concerns the capacity of the industry to manufacture steam turbines. A crucial step in Dr. Adelman's reconstruction of an assumed competitive price in 1952 was an adjustment based upon degree of utilization of capacity, on the premise that a high percentage of utilization of capacity produces an increase in incremental cost and, therefore, of prices, as compared to a low utilization of capaci-

---

173. E.g., Tr. pp. 2855, 4115, 5058–64, 5069; PX 335, 336, 337.

174. PX 281.

175. PX 187. According to GE 150, total factory productivity between 1952–1960 actually decreased in GE's Large Steam Turbine Generator Department. See also PX 241, 242.

176. Tr. pp. 4878–79.

177. Tr. pp. 4885–89; PX 371, 372, cf. Tr. pp. 5179–80.

ty.[178] But each assumption of Dr. Adelman as to industry capacity and utilization thereof was based upon the conclusions of another witness, Paul C. Yoke.

Mr. Yoke's estimates of capacity were not based upon contemporaneous capacity records. Rather, he reconstructed capacity starting with certain benchmark periods—years of peak production with little internal change in the size of the work force or the number of working hours.[179] Observations made on a physical inspection of the plant and the exercise of his expert judgment along with certain data were utilized to determine the proper work force and hours needed to maintain production at normal capacity.[180] The benchmark years were closely analyzed against the standard of normal capacity to enable Mr. Yoke to determine the amount of production flowing from activities at this level.[181] Capacity and utilization of capacity for pre- or post-benchmark years were arrived at through extrapolation of Mr. Yoke's standards against the available production and employment statistics.[182]

There are several reasons why Mr. Yoke's precise figures cannot be accepted as a proper basis for the even more precise use of them by Dr. Adelman. First, the estimates of increased capacity for the years 1959–1963 were primarily based upon increases in the kilowatt ratings of units produced rather than upon changes in physical plant facilities, machinery or work force. The assumed increase in capacity was principally achieved by Mr. Yoke's multiplying a constant number of units by an increasing kilowatt rating, a method which presupposes a questionable direct relationship between increase in kilowatt rating and size of the turbine generator.[183] According to Mr. Yoke, this type of ca-

pacity increase resulted in a lower per cent utilization of capacity. Capacity figures were relevant to Dr. Adelman because in his opinion per cent use of capacity strongly affects incremental costs, and incremental costs, in turn, affect prices; e. g., a very high utilization of capacity increases such costs as overtime pay and shift differential and, therefore, should increase the price of the product. Yet it would not seem that this kind of increase in capacity—increase in kilowatt generating ability of units—would have the direct effect on incremental costs assumed by Mr. Yoke and Dr. Adelman. In addition, Mr. Yoke at times ignored the alleged relationship between changes in unit size and capacity; e. g., despite a sharp drop in average unit size at Allis in 1955, Mr. Yoke doubled capacity for that year.[184]

Second, Mr. Yoke's figures included capacity to manufacture products not sold to electric utilities; e. g., marine turbines and mechanical drive turbines and, therefore, are not relevant.[185] Moreover, Mr. Yoke's figures are complete reconstructions not available to pricing personnel at the time. None of the manufacturers maintained consistent contemporaneous records of capacity measured in kilowatts.[186] Since utilization of capacity is important because of its presumed effect on pricing, it is at least questionable whether reconstructions after the event, by studies unknown to pricing personnel, can be truly significant. Defendants argue, in Dr. Adelman's analogy, that to reject the Yoke study for this reason is to say that before thermometers were invented human beings had no way of telling whether they were hot or cold."[187] But the argument goes too far. No one would use a thermometer today to obtain a

178. Tr. p. 4401. By this step, Dr. Adelman proceeded from a reconstructed competitve price per unit of $4,672,000 to $5,225,000. GE 195A, pp. 2–3.

179. Tr. p. 3611.

180. Tr. p. 3326.

181. Tr. pp. 3184–87.

182. Tr. pp. 3312–13.

183. Tr. pp. 3179, 3288, 3376–87.

184. Tr. p. 3566; GE 127.

185. Tr. pp. 3578, 4613.

186. Tr. pp. 3290, 4614.

187. Tr. p. 4613.

precise temperature reading of five years ago, particularly if precise temperature changes were crucial. Moreover, there is believable evidence that defendants' pricing personnel at times thought they were at least lukewarm when the Yoke thermometer indicated they were cold.[188] Therefore, after thoroughly examining Mr. Yoke's testimony, it is the court's impression that, despite the appearance of mathematical certitude, too much of the study was based upon unverifiable reconstruction. The combination of these flaws in the Yoke study with the expected margin of error in dealing with an "almost indefinable concept,"[189] render the study not persuasive as the necessary basis for the precise calculations of reconstructed competitive price offered by Dr. Adelman. Therefore, for the reasons given above, Dr. Adelman's testimony that collusion did not affect the price of plaintiffs' units is rejected.

Plaintiffs also attack other assumptions made by Dr. Adelman. For example, they characterize the 1961 unit selected for comparison purposes as obsolescent and the price as tainted by the conspiracy, thereby producing too high a price to serve as a basis for comparison,[190] and claim various invalidities in the selection of a productivity factor and its use in Dr. Adelman's formula.[191] Moreover, they point out that since Dr. Adelman conceded that economic factors alone cannot account for the action of prices in the steam turbine generator market from 1957 to 1960 and from 1952 to 1954,[192] his study of the entire period

must be rejected. In view of the above, it is not necessary to deal with these contentions other than to say that some of them are weighty indeed. It should be pointed out, however, that despite rejection of Dr. Adelman's precise reconstructed figures, much of his testimony as to economic theory and analysis is persuasive.

Defendants' other expert economist, Dr. Corson, proceeded in the other direction in comparing prices. He used 1940, a year assumed to be non-conspiratorial, as a beginning reference point. Utilizing various statistical computations and indices of costs and production and his appraisal of forces of supply and demand for the period 1939–1952, Dr. Corson concluded that the level of prices for steam turbine generators in 1952 was not affected by collusion.[193]

There are several problems raised by his testimony. To begin with, it is at least questionable that prices in the base year chosen (1940) were not affected by an illegal conspiracy. I have already found that the conspiracy was in operation then,[194] and Dr. Corson conceded that "if in 1940 the prices were affected by collusion, * * * that year would have been an invalid base year."[195] Moreover, Drs. Corson and Adelman differed as to the usefulness of the chief index used by Dr. Corson and particularly disagreed about the respective weight to be accorded the factors of labor and material costs.[196] Dr. Corson also testified that if book prices increased more than costs, effective collusion would be

188. Examples of contemporaneous documents and statements indicating a fair amount of activity in defendants' shops in the post-1959 period are PX 209, 210; see also Tr. pp. 2576–80. The Yoke study showed per cent utilization of capacity in the same period as relatively quite low. GE 129, 132, 133, 135. Cf. also Tr. p. 3278. There are other indications that some of Yoke's reconstructed figures differed materially from defendants' internal estimates; e.g., compare GE 127 (1959 capacity for Lester plant of 4,900,000 kw) with GE 123, p. 194 (contemporaneous estimate of 4,000,000 kw).

189. Tr. pp. 4610–11.

190. Plaintiffs' Post-Trial Brief, pp. 113–17, 119–20.

191. Id. at 130–45.

192. Tr. pp. 4409–10, 4435, 4786–88a.

193. Tr. pp. 4936–38, 4956–63.

194. See text accompanying notes 43–45 and text following note 110 supra.

195. Tr. p. 4964.

196. Compare Tr. pp. 5121–23 with Tr. pp. 4396–97, 4513–17.

easier to believe.[197] It is, therefore, significant that a contemporaneous GE document in early 1956 shows that its pricing personnel thought that book prices of turbines as large as those in suit had risen 56.2 per cent from 1949 to 1955, substantially more than the increase (36.65 per cent) in cost indices. This document stated:

> We have deliberately increased the prices for the larger ratings substantially more than the smaller ratings in order to increase the gross margins. Inasmuch as we are selling more of the larger units, our prices have been advanced substantially more than the indices and our costs. I believe that this deliberate method of increasing prices had contributed more than anything else to raising the normal gross margin from 13.7% in 1949 to 28.7% in 1955 or a 110% increase.[198]

In addition, if May 1945 is taken as a starting date (when wartime price control had been in effect for three years) and April 1953 as the ending date, turbine generator book prices appear to have increased substantially more than costs, according to a computation offered by plaintiffs.[199] Dr. Corson criticized this computation because it improperly combines indices.[200] However, the method used does not appear improper and the result seems significant. In any event, I find that Dr. Corson's testimony as to supply and demand factors and the relationship between costs and prices in the pre-1953 period does not persuade me either that there was no conspiracy or that it was not effective.

Defendants also point out that Westinghouse lost a great deal of money on the four units it sold to OVEC.[201] Presumably, this is to support an argument that it is ridiculous to imagine that it would have lowered its prices even further. However, at the time Westinghouse expected not to suffer a loss but to make a profit,[202] albeit in a lesser percentage than that predicted by GE. Moreover, apart from the fact that Westinghouse costs would have been lower absent the conspiracy,[203] it is the GE, not the Westinghouse, prediction of profit at the time which is more significant because GE was the low-cost producer. GE budgeted a gross margin of thirty-two per cent on the Clifty Creek units, which margin it regarded as "very profitable," [204] so that the room for downward movement in price, if competition had been effective, was substantial.

To sum up: I do not accept the precise figures of Dr. Adelman or Mr. Yoke or the conclusions of Dr. Adelman and Dr. Corson and the contention of defendants that collusion was ineffective. On the other hand, defendants' economic case is not thereby rejected completely. Despite plaintiffs' arguments to the contrary, much of it was persuasive of a finding that economic factors did contribute to the psychology of a buyer's, rather than a seller's, market and account for some of the greater discount off book in the post-1959 measuring period. For example, while backlogs in 1952 were not much higher than in 1962,[205] industry capacity in the latter year was greater, and there are indications that per cent utilization of capacity was higher in the earlier period.[206] Foreign competition became a real threat in the later period; while earlier it was not.[207] Korean War price control was in effect in 1952 and ended in 1953; [208] after 1959, there was no comparable artificial depressant on

197. Tr. p. 5097.

198. PX 291, dated April 6, 1956.

199. PX 370.

200. Tr. pp. 5121–22.

201. Def. Post-Trial Brief, p. 18.

202. W 49.

203. See text accompanying note 173 supra.

204. PX 284.

205. GE 105.

206. Cf. Tr. pp. 827, 2038–39, 2049–50, 2285–90 with Tr. pp. 2062–66, 2094, 2117.

207. Tr. p. 1560; PX 5, pp. 439–43, 487–89; PX 143, 189.

208. W 47.

price levels which might narrow the gap between book and order prices.

 Plaintiffs minimize the significance of these circumstances and claim that the conspiracy itself tainted the forces of demand and supply so that they cannot be used for comparison purposes; e. g., the defendants created short-run demand by announcing price increases and then allowing sales at the old prices for a short while.[209] While this practice was followed from time to time during the conspiracy, its effect in the fourth quarter of 1952 would not seem to be marked. The most recent increase prior to that key quarter was one effective December 1951, and it was a comparatively modest one of 3.37 per cent. Plaintiffs also argue that even if a combination of collusion and economic facts caused the increase in discounts post-1959, defendants have the burden of isolating these factors.[210] Plaintiffs cite Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946) and Haverhill Gazette Co. v. Union Leader Corp., 333 F.2d 798 (1st Cir. 1964) for this proposition. Accepting this as defendants' burden, it is my belief that they have sustained it; i. e., that to the extent set forth below, I am persuaded that a portion of the increase in discount is due to the economic characteristics of the 1961–1963 period.

*Calculation of Damages*

I conclude, therefore, that plaintiffs' proof of overcharge is based upon a valid theory and is prima facie sufficient, and reject defendants' position that the conspiracy had no effect on the level of prices for the eleven units. I also reject the extreme positions taken by plaintiffs that the wide discrepancy in discounts off book before and after 1959 is wholly due to the end of the conspiracy and by defendants that it is wholly due to a change in the economic climate. The vital question remains to what extent the economic changes from the 1950's to the

1960's account for the radical change in relationship between book and order prices. I am persuaded that the fact, as so frequently is the case, falls somewhere between the two extremes urged by plaintiffs and defendants. In other circumstances, it might be considered rash indeed to attempt to isolate the force of economic determinants on price; even those most learned in the field will agree that such judgments are at best inexact. It is, however, the duty of this court to make just such a determination, and the difficulty of the task does not eliminate the necessity for making it. Triers of fact are, of course, often faced with similar problems of expressing concretely that which is at best only approximate; obvious examples are fixing a figure for pain and suffering and selecting the per cent of negligence of a plaintiff in a Jones Act case contributing to an accident. Cf. W. E. Rippon & Son v. United States, 348 F.2d 627 (2d Cir. 1965).

After much reflection and study of the record and taking all factors into account, including what plaintiffs call their conservative approach, I conclude that the difference in economic factors between 1952 and 1961–1963 accounts for a substantial portion of the discounts off book in the post-1959 era—a figure equal to between four and five per cent as compared to the full 25.33 per cent average discount in the later period. In other words, instead of applying the full 25.33 per cent average discount to arrive at what plaintiffs call the non-conspiratorial price, I would apply only twenty-one per cent, on the theory that the remaining 4.33 per cent of the average discount in the early 1960's was due to economic conditions prevalent in that period. It should be noted that this is a significant reduction from the damages asserted by plaintiffs since their claim is only for the difference between the discount off book actually achieved by plaintiffs in 1952, which was 11.1 per cent (GE) or

209. Tr. pp. 3845–48.

210. Plaintiffs' Post-Trial Brief, pp. 91–92.

11.97 per cent (Westinghouse),[211] and 25.33 per cent, the discount off book plaintiffs say competition would have brought them. This is a total claim of only 14.23 or 13.36 per cent of the book price of the units sold. My finding as to damage eliminates about thirty per cent of the damage claimed. The per cent of damage found would be applied as follows:

| | General Electric | Westinghouse | |
|---|---|---|---|
| PER UNIT | | | |
| Final Order Price | $4,718,255 | $4,750,000 | |
| Own Book Price | $5,308,000 | $5,395,615 | |
| Non-Conspiratorial Discount | | 21% | |
| Non-Conspiratorial Price | $4,193,320 | $4,262.535.85 | |
| Overcharge | $ 524,935 | $ 487,464 [212] | |
| IKEC | | | |
| Overcharge per Unit | $ 524,935 | | |
| Total Overcharge | $3,149,610 (6 units) | | |
| OVEC | | | |
| Overcharge per Unit | $ 524,935 | $ 487,464 | |
| Total Overcharge | $ 524,935 (1 unit) | $1,949,856 (4 units) | |
| TOTALS | | | |
| Overcharges | $3,674,545 | $1,949,856 | $5,624,401 |

This overcharge of $5,624,401 is slightly under eleven per cent of the total final order price for all units ($52,027,785) and slightly under ten per cent of the total final billed price, including escalation ($57,116,819).[213]

It is interesting to note that several specific items in the record indicate that this resolution of the damage question is not far out of line. Thus, the end of 1954 and the beginning of 1955, like the 1961–1963 period, did not present as much of a seller's market as the fourth quarter of 1952.[214] The average quarterly discount off book increased sharply in this period from 3.6 per cent in the last quarter of 1954 to 10.3 per cent for the first quarter of 1955 in the white sale, which was supposedly a period of sharp price reductions.[215] When a meeting of the conspirators brought an end to the burgeoning competition, the average discount off book for the rest of 1955 immediately shrank to 6.8 per cent.[216] A possible view of this is that economic circumstances, even during a conspiracy, caused the average discount to change from 3.6 per cent to 10.3 per

211. I reject the contention (defendants' proposed findings of fact 10, 13) that the discount off book received by plaintiffs was actually larger. Any other concessions achieved by plaintiffs in 1952 can be disregarded for this calculation since plaintiffs undoubtedly would have also obtained them in the 1960's, a period more favorable to buyers.

212. The enact figure is $487,464.15.

213. PX 27, app. D.

214. E.g., defendants characterize 1954 as a "recession year" (Defendants' Pretrial Brief, p. 40); certainly new orders reached a low in 1953 and did not move up much in 1954. PX 206, 346.

215. PX 72A, 84.

216. Ibid.

cent and even conspiratorial meetings could not eliminate all of the effect of market forces so that the average discount continued for a while at 6.8 per cent. The difference between 3.6 per cent in 1954 and 6.8 per cent in the last three quarters in 1955 may be regarded as due to reaction to economic circumstances. Similarly, the average discount off book in the fourth quarter of 1952 was 6.1 per cent. The average discount during the most competitive first quarter of 1955 was 10.3 per cent, indicating that a discount of approximately 4.2 per cent could be attributed to a change in economic conditions from what defendants argue was a buyer's market in 1952 to a less favorable market a little over two years later. The comparison is, of course, not intended to be exact, but it does suggest that it is not unreasonable to attribute 4.33 per cent of the post-conspiratorial period 25.33 per cent discount as due to the change in the market. Similarly, the price of the Clifty Creek units of GE was designed to achieve a gross margin of about thirty-two per cent, which would be regarded by it as "very profitable," [217] indicating a gross margin in the neighborhood of over $1,500,000.[218] Presumably, a reduction in price of about $525,000 per unit in a competitive market would still have been regarded by GE pricing personnel as allowing an acceptable profit margin, since the normal gross margins on cross-compound units in the years from 1949 to 1953 ranged from a low of 11.6 per cent to a high of 15.3 per cent.[219]

In any event, none of the above is suggested as a justification for the precise ultimate finding as to damages which has to be—and is—based upon the conviction of the trier of fact that the designated portion of the greater discount in the post-conspiracy period was due to a change in economic circumstances. It is only offered as an indication that the finding is not unreasonable.

As noted earlier, plaintiffs also claim $5,089,035 for allegedly improper escalation in 1954–1955 of the final order prices to the final billed prices for the eleven units in suit. It appears that this claim is made as an alternative to the primary claim of $8,167,773 based on an overcharge in 1952. Since I have already accepted plaintiffs' main theory of damages, there is no need to rule on their alternate theory. However, it should be noted that this alternate theory of overcharge clearly depends completely upon the testimony of Dr. Adelman.[220] As indicated above, Dr. Adelman offered precise reconstructed competitive prices for the last quarter of 1952 and also for the end of 1954.[221] These figures have been rejected.[222] Therefore, plaintiffs' alternate escalation claim for $5,089,035 would have to fall, in any event, as there is not then sufficient evidence in the record to support the finding of escalation overcharge on the alternate theory claimed by plaintiffs. It should also be mentioned that this claim was not asserted by plaintiffs before trial or in their affirmative case at trial. Plaintiffs went so far as to disavow, in their trial memorandum, any claim based upon "addition-

217. PX 284.

218. Cf. GE 117–122 indicating that the percentage of gross margin is applied to net sales billed which, in the case of the Clifty Creek machines, totalled in each case more than $5 million. It should also be pointed out that the gross margins on these units, according to these exhibits, ranged from 22.2% to 27.5% of the sales price. The discrepancy between these percentages and the 32% gross margin originally budgeted for the machine is due to the fact that the latter was an estimated figure only. Plaintiffs urge

that the actual gross margin would have been closer to the budgeted margin of 32% if adjustment had been made for over-liquidation of indirect manufacturing expenses (IME) and product engineering cost and expenses (PECE) on these exhibits. Cf. Tr. pp. 2952–53.

219. PX 284.

220. Plaintiffs' Post-Trial Brief, p. 148.

221. See text accompanying notes 104, 171–72; Tr. pp. 4754, 4786–90.

222. See text accompanying note 172 supra.

al overcharges on escalation," [223] and, at trial, any claim based upon an increase in the 1953 book price by defendants.[224] Since plaintiffs' alternate claim of overcharge based on escalation is, in fact, premised on the 1953 book price increase, defendants argued at trial that allowing it now would raise substantial questions of fundamental fairness in trial procedure.[225] In view of rejection of the claim, it is not necessary to review this question again.

### Passing-On

Finally, defendants maintain that even if plaintiffs were illegally overcharged, they cannot recover because there were no "damages by [plaintiffs] sustained." [226] Defendants point out that the damages to plaintiffs are increased costs in the purchase of the eleven units, and "plaintiffs are guaranteed to recover from others, as demand charges, all the costs which they now seek to recover from defendants." [227] Since plaintiffs can and will "pass-on" their increased costs in this fashion, defendants argue that plaintiffs should not recover here.

OVEC is owned by various utility companies, in percentages referred to above,[228] comprising ten separate utility systems.[229] These companies purchased 100,000 shares of OVEC's common stock for a cash consideration of $100 per share, a total of $10 million.[230] IKEC is wholly owned by OVEC, which purchased 17,000 shares of IKEC common stock for $200 per share, or $3,400,000.[231] The bulk of OVEC's capitalization was financed by $316,500,000 in bonds purchased mostly by insurance companies and $52,750,000 in notes held mostly by banks.[232] Under various contractual arrangements, OVEC is obligated to supply sufficient power to the AEC for it to meet its requirements, and any surplus power generated will be taken by the various sponsoring companies in the percentages set forth above.[233] The agreements containing these arrangements are the Power Agreement between OVEC and the United States,[234] the Power Agreement between OVEC and IKEC,[235] and the Inter-Company Power Agreement between OVEC and the sponsoring companies.[236] The rates charged the AEC and the sponsoring companies for the power so purchased are set forth in the contract with the United States [237] and the Inter-Company Power Agreement.[238] Rate calculation is based upon two components: an energy charge based upon the cost of fuel, and a demand charge representing fixed charges and operating expenses. These charges are designed to provide OVEC (and therefore IKEC [239]) with sufficient revenue to cover costs, amortize OVEC's out-

223. Plaintiffs' Trial Memorandum, p. 107 n. 33.

224. Tr. pp. 1391, 1403.

225. Tr. pp. 5219-22. Defendants' objections were overruled, but it was made clear that a reasonable adjournment would have been granted, if requested. Tr. p. 5241.

226. Def. Post-Trial Brief, p. 60, quoting from § 4 of the Clayton Act, 15 U.S.C. § 15.

227. Def. Post-Trial Brief, p. 60.

228. See text accompanying notes 3-4 supra.

229. GE 206, pp. 1-2; GE 212, p. 52.

230. GE 211, p. 6. This represented one-half of the 200,000 shares authorized by the Securities and Exchange Commission. Ibid.

231. Ibid.

232. GE 211, p. 7; GE 213, pp. 10-11.

233. See text accompanying notes 3-4 supra. The sponsoring companies may vary among themselves the extent of their power participation. GE 211, pp. 12-13.

234. GE 206.

235. GE 207.

236. GE 210.

237. GE 206, pp. 10-15.

238. GE 210, pp. 14-32.

239. The agreement between OVEC and IKEC provides for the purchase by OVEC of all power generated by IKEC at a rate covering IKEC's operating and capital expenses. GE 212, p. 54.

standing debt over a twenty-five year period and return eight per cent on its common stock.[240] Defendants focus upon the demand charge element of the rate which includes fixed charges covering, among other things, interest and debt amortization.[241] Since the units in suit were originally paid for by a portion of OVEC's debt capital,[242] defendants' argument is that these elements of the rate, in paying off OVEC's debt, enable it to pass on the costs of all eleven units to its customers, the AEC and the sponsoring companies.

The issue of "passing-on" as it affects the electrical equipment antitrust cases generally was dealt with at length in an opinion of this court in Atlantic City Elec. Co. v. General Elec. Co., 226 F.Supp. 59 (S.D.N.Y.), appeal denied, 337 F.2d 844 (2d Cir. 1964). The question arose in the context of objections by plaintiff utility companies to interrogatories addressed to them by defendant electrical equipment manufacturers, seeking information on the extent to which the cost of electric equipment was a determinant of the rates charged by the utilities for their product (electricity). There, it was argued principally that an electric utility company could not be damaged by a conspiracy to overcharge it in the purchase of a steam turbine generator because the increased cost of the unit is taken into account in setting the price to its own customers for electricity; the illegal overcharge is thus "passed-on." The contentions of the parties and the applicable authorities were discussed extensively in Atlantic City and will not be repeated in detail here. The objections to the interrogatories were sustained, and the court held evidence of passing-on of costs to consumers inadmissible as a matter of law.

The authorities relied on included Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918); Chattanooga Foundry and Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906); and Straus v. Victor Talking Mach. Co., 297 F. 791 (2d Cir. 1924), which establish that the Clayton Act permits recovery of unlawfully increased costs by a purchaser regardless of whether he also suffers a loss of profits. The court also justified its result by various policy considerations. Thus (and briefly), it was pointed out that acceptance of the passing-on doctrine would usually insulate antitrust violators from liability, that plaintiffs did not necessarily receive a "windfall" even if they had passed on to their customers part or all of an illegal overcharge for equipment, that, in any event, if a choice had to be made between allocating a windfall to plaintiffs, who have not violated the antitrust laws, or to defendants who have, obviously the former are the more logical parties to receive it, and that recognition of the passing-on doctrine in private antitrust treble damage actions would weaken the function such actions serve in independently enforcing antitrust policy. Atlantic City, supra, 226 F.Supp. at 70–71. The opinion in that case should be regarded as incorporated herein for the purpose of dealing with the passing-on question. Since it was filed, the Court of Appeals for the Seventh Circuit has also rejected passing-on as a defense, Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 335 F.2d 203 (7th Cir. 1964), as has the district court for the Western District of Washington, Public Utility Dist. No. 1 v. General Elec. Co., 230 F.Supp. 744 (W.D.Wash. 1964).

Defendants claim that they are not seeking to relitigate, at least at this judicial level, the issues decided in the earlier opinion. However, they urge that the case now before the court presents a different factual context, principally that recoupment of costs by OVEC and IKEC is guaranteed by the agreements referred to above. This would not appear

---

240. GE 211, pp. 11, 13; GE 212, p. 53.

241. GE 206, p. 11; GE 210, p. 16.

242. This is conceded by plaintiffs' Post-Trial Brief, p. 160.

to be a sufficient reason for distinguishing Atlantic City, if that decision is otherwise sound. Most utilities, while not legally guaranteed a return by their customers, are, in effect, practically assured of a return on investment so that sooner or later costs are recouped.[243] Defendants also, *inter alia,* refer to the "severe problems of proof" envisioned by the court in Atlantic City [244] and argue that there would be none here. Plaintiffs dispute this and claim there would be "serious evidentiary problems in seeking to trace the overcharges incurred by plaintiffs to their customers in this very case." [245] It is not necessary to resolve this issue because, in any event, the extent of the evidentiary problem, while referred to in the earlier opinion, was by no means as important to that decision as the precedents and other policy considerations referred to above.

There is, however, one significant new fact present here that, if anything, suggests that Atlantic City should be followed. Plaintiff utilities here have only one large customer (the AEC) or a narrowly defined and easily identified group of customers (if the sponsoring companies are added by hypothesis), to whom all of their product (electricity) is sold. In such a case—where a utility's entire output is sold to one customer and the customer has paid rates which include a component based upon an illegal overcharge to the utility—that one customer may also have a right to bring suit for the antitrust violation and, equally important, may be in a practical position allowing it vigorously to assert such claims. This, of course, would contrast sharply with the usual situation of an electrical utility selling its product (electricity) to many thousands of consumers, none of whom has the incentive or economic strength to sue. Where there is such a customer, or group of customers,

with the ability to sue the turbine manufacturers, it may be necessary to protect the manufacturers from the possibility of multiple liability.[246] But such is not the case here. Neither the United States nor the sponsoring companies threatens defendants on the claims asserted by OVEC and IKEC; in fact, they have settled all outstanding civil claims against defendants and at no time in the settlement negotiations did any party ever take the position that the OVEC and IKEC claims properly belonged to the AEC or the sponsoring companies.[247] Therefore, allowing passing-on as a defense on this record would, without question, eliminate defendants' liability to anyone for a serious antitrust violation.

For all of these reasons and for those set forth more fully in Atlantic City, supra, the argument that plaintiffs have not been injured in their business or property and have not suffered legal damages because they have passed-on their costs, or will do so, is rejected.

## IV

### *Problems of Evidence*

As indicated above, a substantial portion of defendants' case was the offer of economic evidence, consisting of data as to costs, profits, capacity, utilization of capacity, backlogs and orders for periods running roughly from 1940 to 1963. Defendants contended that this evidence is relevant to both of the major issues before the court—the existence of a conspiracy in 1952 and the fact and amount of damage. Plaintiffs objected to these offers of proof of economic conditions during the conspiratorial period, and extended their objections to any similar evidence concerning any other time period based upon, deprived from, compared with or related to the objectionable evidence.[248] In essence, plaintiffs contend-

---

243. Bonbright, Principles of Public Utility Rates 68–81 (1961).

244. 226 F.Supp. at 69.

245. Plaintiffs' Post-Trial Reply Brief, p. 39.

246. See Atlantic City Elec. Co. v. General Elec. Co., supra 226 F.Supp. at 71.

247. Tr. pp. 5011–20, 5157–58.

248. Tr. pp. 1447–49.

ed—and still do [249]—that collusion so distorts and taints normal economic conditions that this evidence has no relevance unless defendants first demonstrate that absent conspiracy, the data would have been the same.

 Throughout the trial, plaintiffs have maintained that evidence of (1) uniform price movements during the years up to 1959 and (2) the large increase in discounts after exposure of the conspiracy both offer some support for an inference that prices were collusively determined in 1952.[250] Defendants' economic data is directed, in part, to precisely these elements of plaintiffs' case; it is their contention that uniform price movements in this industry up to 1959 and the increased discounts thereafter do not indicate conspiracy but, rather, are normal independent reactions to economic forces. Under the relevant authorities, they certainly must be permitted to introduce evidence—the relevant economic data—in support of this position. Continental Baking Co. v. United States, 281 F.2d 137 (6th Cir. 1960); Pevely Dairy Co. v. United States, 178 F.2d 363 (8th Cir. 1949), cert. denied, 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358 (1950). See also United States v. Chas. Pfizer & Co., 217 F.Supp. 199, 202 (S.D.N.Y.1963); United States v. Eli Lilly & Co., 24 F.R.D. 285, 293 (D.N.J. 1959).

Once it is established that this evidence is properly admissible on the issue of conspiracy, the question whether the court, as trier of fact, should also admit it on the issues affecting damages is far less troublesome. Since this is a non-jury trial, the problem of confusion of the trier of fact is less of a concern and,

since the evidence is admissible on the conspiracy issue, no undue lengthening of the trial will result; discretionary exclusion therefore seems inappropriate. The situation is different from that before the court in Northwest Elec. Power Co-op. v. Moloney Elec. Co., Civ. No. 13290-3, W.D.Mo.1964, the case plaintiffs urge this court to follow and exclude the economic evidence. That case was tried before a jury, and since the defendants had stipulated to a conspiracy, this mass of data would not otherwise have been introduced. Plaintiffs also rely on American Crystal Sugar Co. v. Mandeville Island Farms, Inc., 195 F.2d 622 (9th Cir.), cert. denied, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952). But Mandeville does not stand for the proposition that evidence of economic activity during a conspiracy is inadmissible. Apparently, the allegedly tainted data was received in evidence by the district court in the form of a stipulation; the circuit court's opinion does not indicate that this was error. In computing damages, the district court gave no weight to the stipulated data and relied, instead, upon similar information available for concededly non-collusive periods. The question before the circuit court was only whether the district court had erred in not accepting defendant's assumption that the data was "not in any way tainted, distorted or rendered unreliable" because of the conspiracy.

Plaintiffs also cite United States v. Aluminum Co., 148 F.2d 416, 427 (2d Cir. 1945) as supporting exclusion. Judge Hand's dictum that costs may be inflated in a conspiratorial period has already been referred to [251] in assessing the weight to be given Dr. Adelman's testimony. However, the circuit

---

249. Plaintiffs' Post-Trial Brief, pp. 78–90. Plaintiffs also now argue that Mr. Yoke's capacity study should be disregarded and that defendants have not met their burden of isolating those economic factors not affected by conspiracy. Id. at 90–96. These contentions have been dealt with above.

250. In connection with plaintiffs' offer of evidence of post-1959 price behavior, de-

fendants and plaintiffs reversed positions, and defendants objected to the admission of this evidence either to show conspiracy or damages. Tr. pp. 1089–90. The basis for rejecting defendants' contentions is discussed more fully in Part III of this opinion supra.

251. See text preceding note 173 supra.

court's refusal to give any weight to the cost data in that case was not a finding that it was so tainted as to be inadmissible; rather, since the defendants were wrong as a matter of law in contending that an otherwise illegal monopoly could be excused by evidence that the monopolist made only a fair profit, the evidence, even if untainted, was not relevant to any issue before the court. Defendants make no such contention here. Rather, they urge, even assuming conspiracy, that plaintiffs were charged no more than they would have been under competitive conditions and that the evidence they offer is relevant to that proposition. The latter contention is correct. Plaintiffs would acknowledge, as indeed they must, that the concept of reconstructed competitive price is a vital part of the damage equation in this case. Yet, in insisting that defendants' economic evidence be deemed inadmissible, plaintiffs are, in effect, seeking to preclude defendants from contradicting plaintiffs' computation of an assumed competitive price. Reconstruction of a competitive price based on supply, demand, costs and other economic indicators is a logical and judicially recognized technique. E. g., Union Carbide and Carbon Corp. v. Nisley, 300 F.2d 561, 579 (10th Cir. 1961), appeal dismissed sub nom., Wade v. Union Carbide and Carbon Corp., 371 U.S. 801, 83 S.Ct. 73, 9 L.Ed.2d 46 (1963); see Baush Mach. Tool Co. v. Aluminum Co., 63 F.2d 778, 780 (2d Cir.), cert. denied, 289 U.S. 739, 53 S.Ct. 658, 77 L.Ed. 1486 (1933).

In view of these practical, equitable and legal considerations favoring admissibility, it, therefore, takes more than a naked assertion of total taint to persuade the court to characterize all of this evidence as irrelevant, even assuming the unquestioned existence of conspiracy.[252] Plaintiffs, of course, were not precluded from demonstrating that some or all of this data is distorted and not entitled to weight and were successful to a great degree. But this is a wholly different problem from the issue of initial relevancy and admissibility.

Finally, even assuming that this evidence cannot be considered without expert opinion that the conspiracy did not alter normal economic forces, the record contains such an opinion. It was Dr. Adelman's view that the fact of conspiracy alone does not necessarily lead to a finding that capacity, costs or supply and demand were tainted, or a conclusion that prices were not, nevertheless, determined by normal market forces.[253]

Defendants objected to the introduction of evidence of conspiratorial meetings after January 1955.[254] Plaintiffs frequently stated that they were not asking the court to infer the existence of a conspiracy in 1952 from evidence of competitors' meetings after 1954. Rather, it was their position that this was one continuous conspiracy (as the court has found), and that detailed evidence of post-1954 meetings was also properly admissible to explain the character and purpose of the conspiracy during 1952 and earlier years. Under the relevant authorities, plaintiffs' latter position is also correct. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed. 2d 777 (1962); FTC v. Cement Institute, 333 U.S. 683, 704–705, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). Moreover, since cessation of the conspiracy in 1959 was an integral part of plaintiffs' damage theory, they had a right to prove that until that time it existed with the purpose of keeping order prices close to book. It might be added that, as indicated above,[255] the finding of collusion

---

252. Of course, plaintiffs' argument during trial was, at best, a plea to admit subject to a motion to strike, since they could hardly successfully contend that conspiracy caused distortion at a time when the court had not decided whether conspiracy existed, and, in fact, at a time when the court had not received all the economic evidence relevant to that very issue.

253. Tr. pp. 4315, 4835–36, 4875–77.

254. Tr. pp. 232–33.

255. See text following note 58 supra.

during the period of the purchases in suit would have been made even in the absence of evidence of later meetings.

■ Defendants also objected[256] to the inclusion, in portions of the depositions introduced in evidence, of grand jury testimony released under prior orders of this and other courts.[257] The essence of defendants' objection is that the grand jury testimony is hearsay and, as such, is admissible only under some recognized exception to the hearsay rule. This being so, it is clear that any portion of grand jury testimony offered to impeach a deposition witness or refresh his recollection is properly part of the record for, under familiar rubric, these statements are not offered for the truth of the facts they contain. Certain statements were, however, offered as substantive evidence. In the Second Circuit, these statements appear to be properly admissible under United States v. De Sisto, 329 F.2d 929 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). In any event, no grand jury testimony was necessary to any finding in this case.[258] See United States v. Sten, 342 F.2d 491, 493 n. 1 (2d Cir. 1965).

■■ GE also objected to any use by plaintiffs, directly as an exhibit offered at trial or indirectly in depositions also offered in evidence, of answers to interrogatories filed by GE in power transformer cases in the Eastern District of Pennsylvania.[259] Of course, answers to interrogatories formally filed by a party in a judicial proceeding would appear to be an admission by it, admissible as evidence against the party in some other proceeding. See, e. g., Gada-leta v. Nederlandsch-Amerekaansche, 291 F.2d 212 (2d Cir. 1961); Brayton v. Crowell-Collier Pub. Co., 205 F.2d 644, 646 (2d Cir. 1953). But defendants contend that the Philadelphia court ordered the answers to be compiled from documents allegedly protected as work product, or under the attorney-client privilege, that this was error and that receipt of these answers in evidence magnifies the error and further subverts these privileges. Defendants' position cannot be sustained. In the first instance, as far as the record before this court is concerned, it is a matter of undisputed fact that GE did submit these answers, and this alone sufficiently establishes their admissibility. Moreover, any contention that GE ought not to have been required to furnish these answers is more properly addressed to the court requiring their production. GE has already unsuccessfully litigated these precise questions in that court. City of Philadelphia v. Westinghouse Electric Corp., 210 F.Supp. 483 (E.D.Pa.1962). In any event, as with the grand jury minutes, although the answers to interrogatories have been read by the trier of fact and cited in the course of this opinion, there is sufficient other evidence of conspiracy and its effect to make the answers unnecessary to any key findings. Therefore, the court need not consider whether, even if the Philadelphia court did err, the answers became public knowledge once filed and neither privilege could thereafter survive.

## V

To recapitulate, based upon all the evidence in the case, and my judgment as to credibility of witnesses when appro-

---

256. Tr. pp. 237–38.

257. E.g., Atlantic City Elec. Co. v. A. B. Chance Co., 313 F.2d 431 (2d Cir. 1963); City of Philadelphia v. Westinghouse Elec. Corp., 210 F.Supp. 486 (E.D.Pa. 1962). Defendants contend that these rulings were erroneous but are not pressing that issue at this judicial level.

258. Plaintiffs also sought to introduce the grand jury testimony as past recollection recorded and on the ground that the statements of the conspirators were vicarious admissions by their respective employer defendants (Tr. pp. 290–91).

259. Tr. pp. 1300–15; e.g., PX 137, 139, 144–68.

priate, I conclude that from 1939 through the spring of 1959, defendants and other steam turbine generator manufacturers violated section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in a conspiracy in restraint of interstate trade and commerce in large steam turbine generators, that plaintiffs have sustained their burden of proving that as a result of this price-fixing conspiracy they were overcharged by defendants for each of the eleven turbine units in suit, that the amount of the overcharge paid by OVEC to GE and Westinghouse was $2,474,791 and by IKEC to GE was $3,149,610, or a total of $5,624,401, that defendants fraudulently concealed the unlawful conspiracy from plaintiffs, that there being no contention that plaintiffs knew or, in the exercise of reasonable diligence, should. have known, of the conspiracy during ·its existence, therefore, section 4B of the Clayton Act, 15 U.S.C. § 16b, does not bar this action, and that plaintiffs are entitled to judgment against defendants for an amount tripling the· above damages by them sustained, or $7,424,373 for OVEC and $9,448,830 for IKEC, for a total of $16,873,203. The foregoing shall constitute the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52, 28 U.S.C. An appropriate judgment should be entered. Should there be any matters relating to the judgment which require further consideration by the court, these can be raised by the attorneys for the parties with the court at a mutually convenient time.

This opinion cannot be closed without an expression of appreciation by the court to these attorneys. Without in any way detracting from the excellence of their representation of their clients, they materially shortened the length of the trial by the manner in which they carried out their obligations, and by the cooperation they exhibited to each other and to the court in a myriad of matters, including stipulations, scheduling of witnesses and furnishing of documents.